James L. BLOUNT, Jr., Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted: Feb. 25, 1986.

Decided: July 8, 1986.*

As Revised July 18, 1986.

---

* Following oral argument, decision in this case was reserved pending outcome of *Lockhart v. McCree,* —— U.S. ——, 106 S.Ct. 1758, 1778, 90 L.Ed.2d 137 (1986), decided by the Supreme Court of the United States on May 5, 1986.

Nancy Jane Mullen (argued), Asst. Public Defender, Wilmington and James A. Rambo, Wilmington, for appellant.

Richard E. Fairbanks (argued), Loren C. Meyers and Timothy J. Donovan, Jr. (argued), Deputy Attys. Gen., Wilmington, for the State.

Before CHRISTIE, C.J., and McNEILLY and HORSEY, JJ.

CHRISTIE, Chief Justice:

James L. Blount, Jr., was convicted of murder first degree, robbery first degree, and possession of a deadly weapon during the commission of a felony. The victim was a 68–year old, retired clergyman, Reverend Perry O. Hill, who was walking in Canby Park West in Wilmington, on March 14, 1983, when he was shot to death. Defendant was sentenced to life imprisonment.

There were no eyewitnesses to the killing. However, three witnesses testified that they saw an individual matching defendant's description in the park at about the time of the murder, and Blount made a statement which was admitted in evidence in which he indicated that he had been in the park at about the time of the murder. The murder weapon was found in Blount's residence.

In this case, this Court must decide whether the affidavit supporting the search warrant which led police to the murder weapon contained sufficient facts to establish probable cause to believe the weapon and clothing used by the murderer would be located in Blount's residence ten days after the murder.

This Court has also been asked to determine the significance, if any, of the omission by the police of certain facts from the affidavit the police used in obtaining the search warrant.

Another issue in the case is whether or not the defendant was denied his constitutional right to a fair and impartial jury made up of a cross-section of the community. The trial court declined to grant defendant's motion for separate juries at the guilt and penalty phases of his first degree murder trial. This ruling prevented jurors who were unalterably opposed to capital punishment, but who could fairly try the question of guilt or innocence, from sitting on the guilt/innocence phase of the trial.

In addition, the defendant asks this Court to decide that the Superior Court did not adhere to the mandate of 11 *Del.C.* § 3301 [1] as to *voir dire* questions.

We find no reversible error in rulings of the Superior Court on any of these issues, and so we affirm the Superior Court. *State v. Blount*, Del. Super., 472 A.2d 1340 (1984).

---

1. *Examination upon voir dire in capital cases.*

When a juror is called in a capital case, he shall be first sworn or affirmed upon the voir dire and then asked, under the direction of the court, if he has formed or expressed any opinion in regard to the guilt or innocence of the prisoner at the bar. If his answer is in the negative, he shall be sworn as a juror in the case, unless he has conscientious scruples against finding a verdict of guilty in a case where the punishment is death, even if the evidence should so warrant him, or unless he shall be peremptorily challenged, challenged for cause or excused by consent of counsel on both sides. If his answer to the question be in the affirmative, he shall be disqualified to sit in the case, unless he shall say, upon his oath or affirmation, to the satisfaction of the court, that he feels able, notwithstanding such an opinion, to render an impartial verdict upon the law and the evidence, in which event he shall be a competent juror, if not otherwise disqualified, challenged or excused.

11 *Del.C.* § 3301.

A further issue raised in this case by the State on cross-appeal is whether the trial court must conduct what is known as a "proof positive" hearing under 11 *Del. C.* § 2103 to determine whether a defendant in a capital case should be admitted to bail when the prosecution does not oppose the setting of bail. We hold that Superior Court has no duty under such circumstances to hold such a hearing.

## I.

### A.

Defendant argues that the affidavit used to obtain the search warrant failed to establish probable cause to believe the items sought, the murderer's clothing and weapon, would be found in the place to be searched, which was the defendant's residence. He also contends the search warrant was stale because it was issued on March 24, 1983, ten days after the crime had occurred.

The affidavit revealed that the Reverend Mr. Hill was shot in Canby Park with a .38 or .357 caliber revolver on March 14, 1983, at approximately 2:45 p.m. Information from four witnesses was summarized in the affidavit.

One witness said he was in Canby Park when he heard what sounded to him like gunshots. He shortly thereafter observed a black male running back and forth. He described the person he saw as being in his early twenties, 6' tall, 170 pounds, of medium complexion, wearing a white wool hat, sky-blue shirt or sweater, white pants, and black shoes. He said the man went to his knees two or three times, throwing leaves in the air, apparently trying to conceal something. He left the area and then returned shortly thereafter where he found the victim.

The next two witnesses were a husband and wife who stated that they were in the park at about 1:00 p.m. when they observed a black male in his late teens to early twenties, 6' tall, 165 pounds, wearing an off-white cap, light colored spring jacket, white pants, and black shoes. They said the man appeared nervous.

A fourth witness stated that he observed a black male in the park on March 14, 1983 who was in his twenties, 6' tall, 170 pounds, wearing a white hat, light yellow jacket, and white pants. This witness further indicated that he had also seen this man at nearby Spanish Oaks Apartments.

The affidavit went on to state that when the police searched the park area, they recovered property belonging to the victim on the pathway leading from the park to Spanish Oaks Apartments. Police records revealed that defendant lived there, in Building 31, Apartment 9, and that he was a black male, 25 years old, 6' 1" tall, 170 pounds, and of medium complexion. He had been observed in Canby Park in the past.

The affidavit further recounted that when the police first interviewed the defendant he advised the police that he had no information concerning the shooting. However, when they recontacted him several days later he stated he had been in Canby Park from 11:30 a.m. until 2:30 p.m., which would place him there about 15 minutes before the shooting is believed to have taken place. He further indicated that he had seen a white female and two children in the park. Defendant also indicated that he had used the pathway from the parkland to Spanish Oaks Apartments where the victim's effects were found, and that he lived in Building 31, Apartment 9.

Based on these facts, as recited in the search warrant affidavit, the magistrate concluded there was probable cause to believe the revolver and the suspect's clothing would be located in Building 31, Apartment 9. The Superior Court held that the warrant was supported by an adequate affidavit. This Court affirms that ruling.

An affidavit supporting a search warrant must set forth sufficient facts to warrant a reasonable man in concluding that a crime has been committed and that the property

sought to be seized would be found in a particular place. *Jensen v. State,* Del. Supr., 482 A.2d 105, 110–11 (1984); 11 *Del.C.* § 2306. The facts alleged must "allow the magistrate to make an independent evaluation of the matter." *Id.* at 111; *Franks v. Delaware,* 438 U.S. 154, 165, 98 S.Ct. 2674, 2681, 57 L.Ed.2d 667, 678 (1978). Probable cause is established when a nexus appears between the items sought and the place to be searched. *Hooks v. State,* Del. Supr., 416 A.2d 189, 203 (1980). When the issuing magistrate makes a probable cause determination, a reviewing court will pay great deference to it and accord it a common sense evaluation. *Jensen,* 482 A.2d at 111.

> Concrete firsthand evidence that the items sought are in the place to be searched is not always required in a search warrant.... The question is whether one would normally expect to find those items at that place.... If so, then that inference will suffice to allow the valid issuance of a search warrant for that place.... We think it clear that [the defendant's] residence would be a logical place to search for the weapon and clothing used in the crime.

*Hooks,* 416 A.2d at 203.

As for defendant's claim that the search warrant was stale, it is true that the probable cause to justify the search must exist at the time the warrant is sought. *Jensen,* 482 A.2d at 111. This is to be determined on an *ad hoc* basis and depends upon the nature of the criminal activity alleged. *Id.* Other factors to be considered are the type of property sought and whether it is highly consumable or incriminating and, therefore, less likely to remain in the stated location. *Id.* at 112.

> [T]he "validity of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts relied upon and the issuance of the affidavit".... Hence, whether information has become stale due to an impermissible delay in securing a war-

rant depends upon all the facts as viewed in a flexible and practical manner. *Id.*

In the instant case, as the trial judge noted, a reasonable magistrate could have concluded that the proximity of the defendant's residence to the crime scene could have rendered immediate disposition of the weapon more imprudent than retaining it. Moreover, the weapon and clothing were not consumable and, therefore, were more likely to remain at the defendant's residence. Under the circumstances, we agree with the ruling of Superior Court that the affidavit supporting the search warrant was not subject to valid attack on account of the passage of time.

**B.**

There is a claim that the affidavit was defective because important facts, known to the police, were not recited therein. In *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the United States Supreme Court held that:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to a finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Franks,* 438 U.S. at 155–56, 98 S.Ct. at 2676, 57 L.Ed.2d at 672.

As indicated above, defendant points to several facts which were known to the po-

lice but were not included in the search warrant affidavit. Although the *Franks* decision dealt with misstatements included in probable cause affidavits, the Superior Court in this case and several other courts have concluded that the *Franks* rationale is also to be applied to omissions of facts which are material to a finding of probable cause. *See e.g., United States v. Stanert,* 762 F.2d 775 (9th Cir. 1985), *mod.* 769 F.2d 1410; *United States v. Williams,* 737 F.2d 594 (7th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985); *United States v. Dennis,* 625 F.2d 782 (8th Cir.1980); *United States v. Martin,* 615 F.2d 318 (5th Cir.1980); *People v. Kurland,* Cal.Supr., 28 Cal.3d 376, 168 Cal. Rptr. 667, 618 P.2d 213 (1980) (In Bank); *Yeagy v. State,* Md.Ct.Spec.App., 63 Md. App. 1, 491 A.2d 1199 (1985).

Defendant points out that the following facts were not included in the affidavit supporting the search warrant:

(1) The married couple referred to in the affidavit were unable to identify the defendant's photograph in two separate photo arrays;

(2) Neither of the composite drawings prepared by the police artist from the wife's description accurately depicted the defendant;

(3) There is no mention of the fact that when one of the witnesses observed the defendant in the park on the day of the shooting it was approximately six hours prior to the shooting;

(4) No mention is made in the affidavit concerning the presence of another individual who was in the park at about the time of the shooting although he was similar in height, weight, and age to the defendant and was wearing similar clothes; and

(5) Although one witness had described the subject he had seen as "medium to dark complected" and "late teens to early twenties" in age, the affidavit summarized that description of the person he saw as "medium complexion" and "early twenties."

■ A review of the affidavit reveals that in this case these omissions did not invalidate findings of fact "necessary [in order to obtain] a finding of probable cause...." under the type of test stated in *Franks,* 48 U.S. at 156, 98 S.Ct. at 2676, 57 L.Ed.2d at 672. Therefore, assuming that the *Franks* rationale (which dealt with inaccurate facts which were included in the affidavit) also applies where there are omissions from an affidavit, this Court nevertheless agrees with the conclusion of Superior Court that the defendant has not met the threshold showing required by the rules laid down in the *Franks* opinion.

As to the facts omitted in the couple's identifications, the affidavit indicated Blount stated that he had been in the park at the time he was seen by the witness, and that he saw a white female around the playground area at that time. Thus, the defendant confirmed the witness's observations. Under the circumstances, their later inability to pick him from a photo array or to provide an accurate composite sketch of defendant would not vitiate the probable cause determination based on the facts which were recited in the affidavit. An affidavit designed to establish probable cause is to be considered as a whole and not on the basis of a hypertechnical analysis of its separate allegations. *Jensen,* 482 A.2d at 111. The affidavit need not constitute clear evidence which would justify conviction. *Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

The omission of the fact that, when one of the witnesses saw a subject in the park matching the defendant's description, it was some six hours prior to the shooting likewise does not vitiate the showing of probable cause. The witness's observation shows that defendant frequented the park and, in any event, defendant admitted being in the park about 15 minutes before the killing.

As to the lack of any mention of the presence of another individual in the park, the police investigation, which included a

lie detector test, had excluded the other individual as a suspect in the case. Further, the evidence indicated the other individual was in the park with a companion and was dressed in a manner other than that described by the witnesses. Defendant, on the other hand, admitted being in the park alone close to the time of the murder. The presence of another person in the park was, therefore, not so significant as to be an essential part of the affidavit.

Defendant's final complaint as to the affidavit concerns the omissions from the description of the individual seen by the fourth witness. However, the age given in the affidavit was within the range given by the witness. In addition, when the detective asked the witness if the suspect appeared to be young, the witness replied he did not. Thus, the detective can be regarded as having narrowed down the description to the early twenties. The suspect's complexion was also within the range given by the witness. Moreover, the witness told the detectives that the shadows of the trees may have made the suspect appear darker complected than he actually was. Therefore, there is nothing so inaccurate in the affiant's notation of this witness's description of the suspect as to invalidate the warrant.

We agree with the Superior Court in its ruling that the omissions from the affidavit would not have altered the finding of probable cause had they been included in the affidavit. This Court finds no reason to believe that the omissions were intended to distort the truth. We find no merit to the challenges to the search warrant.

### C.

The Superior Court, in ruling on defendant's motion to suppress the murder weapon, held that defendant lacked standing to challenge the search. Defendant contests this determination. However, in view of the conclusion this Court reaches, that the search warrant was valid to support the search, it is unnecessary for this Court to rule on the standing issue.

### II.

Based on the District Court's decision in *Grigsby v. Mabry*, 569 F.Supp. 1273 (E.D. Ark.1983), *aff'd*, 758 F.2d 226 (8th Cir.1985) (*en banc*), later *rev'd sub nom. Lockhart v. McCree*, —— U.S. ——, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), Blount filed a pretrial motion in the Superior Court requesting separate juries at the guilt and penalty phases of his trial. He urged that the jury at the guilt phase not be "death-qualified." Death qualification is the procedure by which jurors who could not under any circumstances vote to impose the death penalty are disqualified from serving on a jury in a case where capital punishment is a possible penalty. They are not permitted to serve on the jury during the guilt/innocence phase of the trial, as opposed to the penalty phase, despite the fact that they maintain they could set aside their unalterable opposition to the death penalty and impartially try the issue of guilt or innocence.

The trial court held an evidentiary hearing at which the defendant presented evidence in an attempt to show that death qualified juries were conviction prone and, therefore, the automatic exclusion of all other jurors violated defendant's right to a fair and impartial jury under the sixth and fourteenth amendments and article I, § 7 of the Delaware Constitution. He also argued that a jury so selected violated his sixth and fourteenth amendment and Delaware Constitutional rights to a representative jury chosen from a cross-section of the community as well as his rights under 11 *Del.C.* § 3301. The Superior Court denied the defendant's motions. *State v. Blount*, Del.Super., 472 A.2d 1340 (1984).

During the course of jury selection, two jurors were excused by the court when they said they could not vote to impose the death penalty even though, despite their unalterable opposition to the death penalty, they could fairly judge the defendant's guilt or innocence.

## A.

In *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the Supreme Court held that "a sentence of death cannot be carried out if the jury which imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id.* at 522, 88 S.Ct. at 1777, 20 L.Ed.2d at 784–85. The Court said that the jury imposing the death sentence from which all those with any scruples against the death penalty were excluded was "uncommonly willing to condemn a man to die." *Id.* at 521, 88 S.Ct. at 1776, 20 L.Ed.2d at 784.[2]

The Court left for another day the question of whether a jury from which all those who are unalterably opposed to the death penalty, but who could fairly try the question of the defendant's guilt or innocence (as opposed to his sentence), were excluded would be biased in favor of conviction. The data was "too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt." *Id.* at 517, 88 S.Ct. at 1774, 20 L.Ed.2d at 782. The court could not conclude that excluding jurors opposed to capital punishment resulted in a jury that was not impartial because it substantially increased the risk of conviction or resulted in a jury which did not represent a fair cross-section of the

community. *Id.* at 518, 88 S.Ct. at 1775, 20 L.Ed.2d at 784. The court invited a future defendant to attempt to establish that the jury was less than neutral with respect to guilt. *Id.* at 520 n. 18, 88 S.Ct. at 1776 n. 18, 20 L.Ed.2d at 784 n. 18. If a defendant could establish that, then the court said the question would arise whether the State's interest in submitting the penalty issue "to a jury capable of imposing capital punishment may be vindicated at the expense of the defendant's interest in a completely fair determination of guilt or innocence—given the possibility of accommodating both interests by means of a bifurcated trial, using one jury to decide guilt and another to fix punishment." *Id.*

## B.

The defendant argues, based on studies that have been done since *Witherspoon*, that the jury which convicted him was conviction prone and thus he was denied his right to an impartial jury. In addition, he argues that he has been denied his right to a jury representing a fair cross-section of the community.

This Court has reviewed the transcript of the hearing in Superior Court and the studies referred to by Superior Court. *Blount*, 472 A.2d 1340. We find that opinion accurately describes those studies. While we have some reservations concerning the validity of the studies, we will follow the lead and the ruling of the United States Su-

---

**2.** For some time, it was thought that under *Witherspoon* veniremen could be excluded from the jury for cause only if they

made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt*.

*Id.* at 522 n. 21, 88 S.Ct. at 1777 n. 21, 20 L.Ed.2d at 785 n. 21.

More recently the Court has clarified the test for when a prospective juror may properly be excluded from a jury based on his views about capital punishment. "[A] juror may not be chal-

lenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581, 589 (1980). If a prospective juror is excluded on any broader grounds than his ability to follow the law or abide by his oath, the court said the death sentence cannot be carried out. *Id.* at 48, 100 S.Ct. at 2528, 65 L.Ed.2d at 591. The apparent conflict between the two-part *Witherspoon* test and this test enunciated in *Adams* is to be resolved in favor of the *Adams* test. *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

preme Court which has stated since this case was argued that it

> will assume for purposes of this opinion that the studies are both methodologically valid and adequate to establish that "death qualification" in fact produces juries somewhat more "conviction-prone" than "non-death-qualified" juries. We hold, nonetheless, that the Constitution does not prohibit the States from "death qualifying" juries in capital cases.

*Lockhart*, —— U.S. at ——, 106 S.Ct. at 1764, 90 L.Ed.2d at 147.

### C.

■ This Court will now turn to the question of whether a jury from which jurors who could make an impartial decision as to guilt or innocence (even though they could not impose the death penalty under any circumstances) are excluded violates the fair cross-section requirement of the sixth and fourteenth amendments and the Delaware Constitution.

In *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), the Supreme Court held the states are bound by the sixth amendment's requirement that the *venires* from which juries are drawn must represent a cross-section of the community.

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579, 586–87 (1979). *See also, Riley v. State*, Del.Supr., 496 A.2d 997, 1008 (1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986); *Ross v. State*, Del.Supr., 482 A.2d 727, 732 (1984). When the defendant makes a *prima facie* showing of an infringement of the fair cross-section requirement, the burden shifts to the State to justify the infringement by showing that attaining a fair cross-section is incompatible with a significant State interest. *Duren*, 439 U.S. at 368, 99 S.Ct. at 671, 58 L.Ed.2d at 589–90. In order to satisfy the "distinctive" group requirement of *Duren*, a group must have "a unique outlook or 'perspective on human events' not shared by other segments of the community ... and this distinctive requirement must exist as to a substantial number of people." *Van Arsdall v. State*, Del.Supr., 486 A.2d 1, 11 (1984), *vacated on other grounds*, —— U.S. ——, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

The defendant argues, based on studies that have been done since *Witherspoon*, that the group comprised of potential jurors who could fairly determine guilt or innocence regardless of the fact that they could never impose the death penalty comprise a distinctive group within the meaning of the *Duren* case. Moreover, the defendant argues that by excluding such people from juries, representation of this group is not fair and reasonable in relation to the number of such persons in the community and that this under-representation is due to systematic exclusion of the group in the jury selection process.

This argument was also recently addressed by the United States Supreme Court in the *Lockhart* case. The Court there determined that jurors excluded under *Witherspoon* "do not constitute a 'distinctive group' for fair cross-section purposes" and that excluding those jurors does not violate the fair cross-section requirement. *Lockhart*, —— U.S. at ——, 106 S.Ct. at 1766, 90 L.Ed.2d at 149. We agree with the reasoning and rule enunciated by the Supreme Court, and we interpret Del. Const. art. I, § 7 (1897) as imposing corresponding standards. *Cf. Riley*, 496 A.2d at 1008 (Black jurors constitute a "distinctive group."); *Ross*, 482 A.2d at 732–34 (Jurors who are unable to return a verdict of guilty

where the penalty might be death, even if the evidence should so warrant, are not a "distinctive group").

### D.

██ This Court now turns to the defendant's argument that exclusion of jurors from the guilt/innocence phase of his trial who could impartially try that issue violated his right to a fair and impartial jury. In the *Lockhart* case the Supreme Court stated that exclusion of jurors under the *Witherspoon* rule "served the State's entirely proper interest in obtaining a single jury that could impartially decide all of the issues in [the defendant's] case." *Lockhart,* —— U.S. at ——, 106 S.Ct. at 1768, 90 L.Ed.2d at 152. There is a long established statutory preference in Delaware (as there is in Arkansas) for a single jury, qualified to try both phases of a capital trial. *See* 11 *Del.C.* §§ 3301, 4209.

If a second jury were selected after the defendant had been convicted, it would not have heard the evidence stablishing his guilt. The case would then have to be substantially retried under the death penalty statute, 11 *Del.C.* § 4209. The State has a strong interest in avoiding such repetitive trials. If, on the other hand, additional jurors were selected at the beginning of the trial who would hear the trial and be substituted for the jurors who could not impose the death penalty at the beginning of the penalty phase of the trial, then these new jurors would have to deliberate on the penalty with jurors who had already deliberated on and considered the evidence at the guilt/innocence phase of the trial. These new members would be ignorant of the prior discussions, running afoul of the concept that a jury reach a verdict through deliberations which are the common experience of all jurors. Moreover, with one jury, the defendant receives the benefit of any lingering doubt that may not have been enough to justify acquittal but is sufficient to preclude a death sentence. *Smith v. Balkom,* 660 F.2d 573, 579–82

(5th Cir.1981) *mod. on other grounds,* 671 F.2d 858 (5th Cir.1982).

Based on this rationale, this Court is of the opinion that both the United States and Delaware Constitutions

> presuppos[e] that a jury selected from a fair cross-section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case.

*Lockhart,* —— U.S. at ——, 106 S.Ct. at 1770, 90 L.Ed.2d at 154. *Blount's* jury satisfied this standard.

### E.

The defendant has also argued that 11 *Del.C.* § 3301, Delaware's *voir dire* statute for capital cases, is exclusive and authorizes the exclusion of a venireman for cause only if the juror cannot render an impartial verdict on guilt or innocence because of his conscientious scruples against the death penalty. The defendant contends that under § 3301, a venireman may not be excluded for cause if he can impartially try the question of guilt or innocence, regardless of his ability to impose the death penalty.

Under § 3301, a juror who has not formed any opinion regarding the guilt or innocence of a defendant is to be sworn as a juror "unless he has conscientious scruples against finding a verdict of guilty in a case where the punishment is death, even if the evidence should so warrant him...." In addition, a juror who has no preconceived notion concerning the defendant's guilt or innocence is not to be sworn as a juror in the case if he is otherwise, among other things, *"challenged for cause".* (Emphasis added.) If a juror has formed an opinion regarding the guilt or innocence of a defendant, he is disqualified unless he can swear or affirm that he can render an impartial verdict notwithstanding that opinion *"if not otherwise disqualified, challenged, or excused."* (Emphasis added.)

■ The statute clearly evidences a legislative intent that there be challenges for cause other than those specifically spelled out in the statute. In view of Delaware's preference for a single jury proceeding, such a challenge for cause exists when a potential juror states that he cannot impose the death penalty regardless of the evidence presented. This Court, therefore, rejects the defendant's argument.

### III.

Article I, § 12 of the Delaware Constitution provides that "All prisoners shall be bailable by sufficient sureties, unless for capital offenses when the proof is positive or the presumption great...." That directive is implemented by 11 *Del.C.* ch. 21 and, in particular, by 11 *Del.C.* § 2103. Section 2103(b) provides that, "The Superior Court may admit to bail a person charged with a capital crime if, after full inquiry, the Superior Court shall determine that there is good ground to doubt the truth of the accusation, and the burden of demonstrating such doubt shall be on the accused." This Court has ruled that § 2103(b) contains a proper definition of the mandate contained in article I, § 12 that bail shall be allowed in capital cases unless "there is proof positive or presumption great." *In re: Steigler*, Del.Supr., 250 A.2d 379, 382 (1969).

In this case the State did not oppose the setting of bail under § 2103. The defendant was serving time on another offense but had been released on what is known as "supervised custody" at the time the crime was committed. He was to be incarcerated for violations of the conditions of his supervised custody whether there was a bail hearing or not.

The Superior Court concluded that the defendant was "entitled", under the law, to have this proof positive hearing, which amounts to a preliminary hearing, since he is charged with murder in the first degree. The Superior Court said that under the statute it had "an affirmative obligation to hear evidence and make a determination

with respect to bail...." In view of the State's cross-appeal challenging this ruling, the Court must determine whether a hearing was required under the circumstances. This, in turn, requires us to consider the significance of the phrase "after full inquiry" as used in 11 *Del.C.* § 2103 as it may apply in a case where the State does not oppose the setting of bail.

Under 11 *Del.C.* § 2103(b), the burden of demonstrating good ground to doubt the truth of the accusation is on the defendant. However, the State has the burden of going forward with evidence showing proof positive or presumption great. *Steigler*, 250 A.2d at 382–83. Since the burden of going forward with evidence is on the State, if the State presented no evidence at a bail hearing in a capital case, the State would not have met its burden and the Superior Court would have had a duty to set bail for the defendant. Under the circumstances, it would be placing form over substance if a hearing were still required even though the State had consented to the setting of bail. The rule must be then that if the State consents to bail, or, in the alternative, presents no evidence at a bail (proof positive) hearing, the Superior Court need go no further in making a "full inquiry" under § 2103(b). The defendant has accomplished all he was entitled to have accomplished by such a hearing, and there is no longer a reason for the hearing.

The defendant argues that if this Court allows the State to waive this form of a bail hearing in capital cases this Court would be functionally delegating to the prosecutor the determination of whether a defendant in a capital case should have bail set. This argument over simplifies the situation. We, however, know of no reason why the constitution and the statute would not place a part of this responsibility upon the prosecutor.

Defendant points out that in the *Steigler* case this Court stressed that such a determination was vested in the Superior Court alone under § 2103. *Steigler*, 250 A.2d at 382. We note, however, that in an analo-

gous situation, at trial, the State has the all-inclusive right to go so far as to enter a *nolle prosequi* on the charge against the defendant. In such a case no trial is held and the charges are dropped. It is not suggested that in that situation the judicial function of determining guilt or innocence had been improperly delegated to the prosecution.

Similarly, there is no delegation of the judicial function to the prosecution in a case where the prosecutor refuses to enter evidence at a bail hearing in a capital case or simply indicates he does not oppose the setting of bail. The "full inquiry" Superior Court is required to make before admitting a capital defendant to bail is satisfied if the need and purpose of the inquiry is eliminated.

The defendant points out that in *Foraker v. State*, Del.Supr., 394 A.2d 208, 214–15 (1978), the trial court allowed the State to consent to the admission of the defendant to bail without a formal hearing. The defendant then argued that because the State agreed to bail, it was estopped from proceeding on the first degree murder charge. This Court disagreed, observing that the defendant had been admitted to bail without having to meet the rigorous requirements of 11 *Del.C.* § 2103 and, therefore, was in no way prejudiced. The defendant in this case points out that in reaching that conclusion this Court characterized the State's action in consenting to bail as "an improper bail procedure." *Foraker*, 394 A.2d at 215. That characterization was purely *dicta*.

■ We hold that the State's agreement to the effect that bail may be set in a first degree murder case relieves the Superior Court of any obligation to hold a "proof positive" hearing. Such an agreement by the State does not deprive the Superior Court of the right to hold a hearing, if and only if, it sees fit to do so in order to ascertain facts which may assist the court in determining the appropriate amount of bail to be set.

\*　　\*　　\*　　\*　　\*　　\*

The judgment of the Superior Court is affirmed as to the conviction of the defendant. On the cross-appeal, the decision of the Superior Court that it must hold a "proof positive" hearing in every capital case where bail is sought is reversed.