STATE of Delaware

v.

Steven P. ADAMS, Defendant.

Criminal Action Nos. IN–07–12–0915, IN–07–12–0916, IN–07–12–0917, IN–07–12–0918, IN–07–12–0919, IN–07–12–0920.

ID No. 0711017054.

Superior Court of Delaware, New Castle County.

Submitted: June 13, 2008.
Decided: Aug. 22, 2008.

Brian D. Ahern, Esquire, Deputy Attorney General, Department of Justice, Wilmington, Delaware, attorney for the State of Delaware

John S. Malik, Esquire, of Wilmington, Delaware, attorney for the defendant

## *OPINION*

HERLIHY, Judge

Defendant Steven Adams has moved to suppress two separate sets of evidence. The first set was from a car, stopped for a traffic offense, in which he was a passenger. He contends the police lacked reasonable articulable suspicion to detain him, did not follow proper detention procedures and, finally, lacked probable cause to arrest him and seize the evidence from the car.

Subsequent to that arrest, the police obtained a search warrant for his residence. Adams claims the affidavit of probable cause is insufficient and, therefore, the evidence seized from his residence should also be suppressed.

A suppression hearing was held during which the circumstances of the car stop and arrest were developed. The hearing revealed an additional issue, however. The actual "searching" of Adams' residence began after 10:00 p.m., but the search warrant was issued at 9:59 p.m. It did not explicitly authorize a nighttime search which Delaware law expressly requires for searches occurring after 10:00

p.m. However, officers waiting at the residence entered it at 9:59 p.m. when told of the warrant's issuance. The issue of whether an express nighttime authorization was needed in this case came into focus.[1]

The Court has determined that the arrest and evidence seized at the scene of the traffic stop are valid but that the search warrant lacked sufficient probable cause to permit the search of the residence. Based on that finding, the Court need not resolve the nighttime search warrant issue.

### Factual Background

The factual setting for this motion is a combination of the affidavit of probable cause for the search warrant and testimony at the suppression hearing. There are two parts to this matter, Adams original arrest which was more fully brought out in the suppression hearing and the subsequent search of his residence set in motion by that arrest. As noted, Adams challenges the propriety of both.

First the affidavit of probable cause:

1) Your affiants are Detective Mitchell Rentz and Detective Andrea Janvier, both sworn member of the Wilmington Department of Police, are assigned to the Drug Organized Crime and Vice Division. Your affiants have over 19 years of police experience. Your affiants have authored and/or coauthored in over fifty search warrants. Your affiant has arrested over one hundred drug offenders leading to numerous drug convictions. Your affiants have attended numerous schools dealing in the illegal distribution of controlled substances as well as the preferred methods of drug traffickers.

2) Your affiants can state that during the second week of October 2007 a confidential informant advised that a black male known possibly as "Tarmel" sells cocaine from within 1903 w. 8th Street, Apartment # 1, Wilmington, Delaware. This individual is also known to frequent the area of 8th and N. Jefferson Street, or the 600 block of W. 8th street, Wilmington.

3) Your affiants can state that on numerous occasions during second, third week of October and the first two weeks of November 2007 visual surveillance was set up in the described area. A black male approximately 5'08, 170–180 with muslim beard and bald head, and frequently wears a kufe (* *muslim garb) was observed traveling from the 600 block of w. 8th street, directly to 1903 N. Lincoln Street, apartment # 1. This individual would enter the dwelling and return within 3–10 minutes. Often he would be driven by different females, who stayed in their vehicles. On other occasions he would occupy rental vehicles.

4) Your affiants can state that a deljis check was conducted for the nickname of "tarmel". The only one was identified as Sean Mckenzie, bmn 03–10–1971.

5) On 14 November 2007 your affiants along with assisting units set up visual surveillance on 1903 w. 8th street, apartment # 1. At approximately 2038 hours a grey in color Hyundai bearing Maryland registration 6BYE75 pulled into the 1900 block of w. 8th street. A black male wearing dark clothing, with a black kufe on his head exited the passenger side of this vehicle and responded in with

---

1. There was post-hearing briefing.

keys to 1903 w. 8th street, apartment # 1. At approximately 2047 hours this male exited the dwelling and re-occupied the passenger seat of the vehicle.

6) Your affiants can state that as the described vehicle pulled into the flow of traffic from a parked position she did not signal. Further, the front seat passenger did not have a seat-belt on. Assisting units with emergency equipment came to assist. At approximately 2052 hours a motor vehicle stop was conducted at 6th and n. franklin street. The passenger identified as steven adams, bmn 06–24–1974 opened the door of the vehicle and put his right arm in the passenger floorboard area. He then looked as if he was going to run. He was placed into custody. In plain view on the described floor board area a clear knotted bag was located containing a tan, chunky substance to wit crack-cocaine (*later field tested positive with a approximate weight of 7.5 grams, further a small knotted bag containing marijuana was located (* *field tested positive with an approximate weight of 1.0 grams). The operator of the vehicle was identified as Natisha Winder, bfn 07–14–1975. Her son Marquis Carpenter, bmn 06–07–1999 was a rear seat passenger.

7) It should noted that Steven Adams has an address of 1903 w. 8th street, apartment # 1 his ID card. Further, as of June 20, 202 he is a convicted drug felon. He was found guilty of possession of schedule II narcotic within 300 ft of a park.

8) Your affiants can state that units immediately responded to the described residence to conduct continued surveillance while these investigators applied for said search warrant.[2]

This affidavit relates some of the details of Adams' arrest, but not all. Wilmington police officer Andrea Janvier testified at the hearing. The "Tamel" described in the affidavit is not Adams. It was a Sean McKenzie. The surveillance, as it turned out, was of Adams, not McKenzie. On November 14, 2007, the police observed Adams in a car with Maryland tags. The car pulled out onto a public street from a parking space on that street without first signaling. The car was stopped. A female was driving. Adams was a passenger.

Another officer went up to Adams. He felt that a movement or movements Adams made was an attempt to flee. Adams had opened the passenger door and put an arm out. The other officer from outside the car saw on the floorboard inside the car a bag with a tannish chunky substance in it and another small bag. Field tests, as the affidavit describes, was positive for cocaine and marijuana, respectively. These items were in plain view from the car's exterior; a fact which Adams does not dispute.

From there Detectives Andrea Janvier and Mitchell Rentz went to Justice of the Peace Court # 20 to obtain a search warrant for 1903 W. 8th Street (near Lincoln Street in Wilmington). Other officers went to that address. Officer Janvier called those officers at 9:59 p.m. to tell them the warrant had been issued. They went inside, Officer Todd Riley testified—who was one of those at the scene-with the keys seized from Adams at the traffic stop. Riley said none of these officers searched the residence; they only secured it. They waited for Janvier and Rentz to arrive with the warrant and then the actual search began, which was around 10:15 p.m.

2. Affidavit of Probable Cause.

### Applicable Standards

 There are two standards by which to examine Adams' challenges to the street arrest and seizure and the search warrant. Since the arrest at 6th and Franklin Streets and the seizure of the evidence from the car were without any warrants, the State has the burden of proving the propriety of that arrest and seizure.[3] The burden shifts, however, when the challenge is made to the sufficiency of the search warrant and the manner of execution. The defendant must show where the search violated his federal and state constitutional rights.[4]

### Discussion

### I

### A

 Since the search warrant for 1903 W. 8th Street is premised on the "traffic stop" arrest and search, the Court must consider that action first.

 Adams was not the driver. The basis for stopping the car was that the driver had failed to signal her movement from a parked position on a public street into the main path of travel on that street. This is a violation of the Motor Vehicle Code.[5] Adams was a passenger and this incident would not have been set in motion but for that motor vehicle violation.[6] Mo-tor vehicle violations constitute a lawful basis to stop a vehicle.[7]

This Court is aware that in *State v. Heath,* this Court found that Article I, § 6 of the Delaware Constitution prohibits "purely pretextual" stops.[8] It did so by finding the Delaware Constitution can be read to provide greater protection than the 4th Amendment to the United States Constitution.[9] That the Delaware Constitution can in some instances, provide broader protections of rights than those protected by the United States Constitution is well-established.[10] In *Heath,* this Court found that a local police officer's use of § 4155, failure to signal, was pretextual and suppressed the evidence which had been seized.

In reaching that result, this Court held Article I, § 6 provided more protection than the 4th Amendment as interpreted in *Whren v. United States.*[11] This Court in *Heath* set up a multi-part test to determine if the stop was or was not pretextual.[12] The United States Supreme Court in *Whren* rejected such a test(s).

For obvious reasons of comity, consistency and efforts to minimize confusion, judges on this Court usually follow precedent as enunciated by their colleagues. But the Court in this case cannot do so in this instance. There are too many occasions where, as here, there was a lawful basis to stop a motor vehicle for a traffic

---

3. *Hunter v. State,* 783 A.2d 558, 560 (Del. 2001); *State v. Henderson,* 906 A.2d 232, 235 (Del.Super.2005).

4. *State v. Sisson,* 883 A.2d 868 (Del.Super.2005).

5. 21 *Del. C.* § 4155(d).

6. *Compare McDonald v. State,* 947 A.2d 1073 (Del.2008)(pulling from a private driveway is not a violation of § 4155).

7. *Watson v. State,* 892 A.2d 366, 368 (Del. 2005); *Ingram v. State,* 2004 WL 2154325 (Del.).

8. 929 A.2d 390, 401 (Del.Super.2006).

9. *Id.* at 402.

10. *Hughes v. State,* 490 A.2d 1034 (Del.1985).

11. 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

12. *Heath,* 929 A.2d at 403.

violation which led later to arrests for other kinds of offenses.

As long as the stop is factually supported, as here, and even if pretextual, this Court will not deprive law enforcement of this valuable tool. This case and so many others we hear in motions to suppress are unlike the rare but troubling cases such as *Caldwell v. State*.[13] In that case, where the initial traffic stop got significantly prolonged into an investigation unrelated to the initial violation, the Delaware Supreme Court said:

> The duration and execution of a traffic stop is necessarily limited by the initial purpose of the stop. As the Maryland Court of Appeals has held, any investigation of the vehicle or its occupants beyond that required to complete the purpose of the traffic stop constitutes a separate seizure that must be supported by independent facts sufficient to justify the additional intrusion. Once the officer has issued a citation or warning and has run routine computer checks, the vehicle must be released unless the driver voluntarily consents to further questioning or the officer uncovers facts that independently warrant additional investigation. In short, an officer's observation of a traffic violation "does not confer the right to abandon or never begin to take action related to the traffic laws and, instead, to attempt to secure a waiver of Fourth Amendment rights. . . ."

Even where the traffic stop is not formally terminated by the issuance of a citation or warning, "the legitimating *raison d'etre* [of the stop may] evaporate if its pursuit is unreasonably attenuated or allowed to lapse into a state of suspended animation. Whether a given detention is 'unreasonably attenuated' necessarily involves a fact-intensive inquiry in each case. This standard respects the State's interest in investigating suspicious conduct during a valid traffic stop, while restricting police officers' authority to employ marginally applicable traffic laws as a device to circumvent constitutional search and seizure requirements." [14]

In *Caldwell*, the Supreme Court ruled that the stop was permissible—parking next to a yellow curb—and that detention questions could be asked, but once all that was done, what happened thereafter became a second, undisputed investigation unrelated to the initial violation.[15] The Delaware Supreme Court held that its ruling was consistent with *Whren*.[16]

*Whren* has been cited with approval in other Delaware Supreme Court and Superior Court cases.[17]

Candor compels this Court to refer to *Demby v. State*[18] where the Supreme Court repeated[19] that it has not determined that pretextual motor vehicle stops violate the Delaware Constitution. The Court noted *Heath* in passing, but without further comment.[20]

---

13. 780 A.2d 1037 (Del.2001).

14. *Caldwell*, 780 A.2d at 1047–48.

15. *Id.* at 1049.

16. *Id.*

17. Besides those cases cited elsewhere in this opinion aligning Delaware jurisprudence with *Whren*, See, e.g. *Howard v. State*, 2007 WL 2310001 (Del.); *Culver v. State*, 956 A.2d 5 (Del.2008); *State v. McDannell*, 2006 WL 1579818 (Del.Super.); *State v. Darling*, 2007 WL 1784185 (Del.Super.).

18. 2008 WL 534273 (Del.).

19. *See Howard v. State*, 2007 WL 2310001 (Del.).

20. *Demby*, 2008 WL 534273 at *3.

This Court believes it is best for the Delaware Supreme Court to determine whether pretextual motor vehicle stops violate the Delaware Constitution despite *Whren*, years of jurisprudence, and the impact on law enforcement. Their prior decisions, however, do not suggest that it would find that such stops are a violation.

But the Court in this case is dealing with violations of two motor vehicle laws, one by the driver and one by the passenger, Adams. And because Adams was the passenger and is charged with failure to wear a seat belt, new issues arise.

Those issues revolve around the history of Delaware's statutes relating to seat belt usage. The first iteration of such legislation is in 68 *Del. Laws* c. 34 (Effective May 16, 1991) which added a new chapter 48 to Title 21 and which provided in part pertinent to this case:

§ 4802. Driver Requirements: Front Seat Passenger: Exception: Sales Requirements: Working Condition of System:

a.(1) The driver of a motor vehicle operated on a street or highway in this State shall wear a properly adjusted and fastened seat belt which meets the applicable federal motor vehicle safety standard:

(2) The driver of a motor vehicle shall secure or cause to be secured in a properly adjusted and fastened seat belt system, as defined by the applicable federal motor vehicle safety standards, any passenger in the front seat.

\*　　\*　　\*　　\*　　\*　　\*

d. A motor vehicle shall not be stopped by a police officer for failing to comply with this section.

\*　　\*　　\*　　\*　　\*　　\*

g. Failure to comply with this Section shall be considered as an aggravating circumstance for sentencing purposes

for persons convicted of violations of other provisions of Title 21 of the Delaware Code. Any person who is found to have violated this section in connection with the prosecution of a violation of any other provision of Title 21 of the Delaware Code shall in addition to any fine and at the same time as, any fine is assessed to the defendant, be levied for credit to the Victim Compensation Fund an additional penalty assessment of 40% not to exceed $20.00 of every fine, penalty or forfeiture imposed or collected by the court for the Title 21 *Del. C.* offense. Where there are multiple Title 21, *Del. C.* offenses involved, the penalty assessment pursuant to this Section shall be based upon a total fine for all offenses but not to exceed a total additional penalty assessment of $20.00. When a fine, penalty or forfeiture is suspended in whole or in part the additional penalty assessment shall not be suspended.

This new law was formerly House Bill 80 and the synopsis to it provided:

This Bill would make failure to use seat belts an aggravating circumstance for sentencing purposes. Persons convicted of violations of other provisions of Title 21 of Delaware Code would be assessed an additional 40% not to exceed $20.00 of their fine. Such assessment would be for the Victim Compensation Fund. There would be no adjudication of guilt nor would there be a fine.

There have been several amendments to 21 *Del. C.* § 48 since 1991 but only one is significant for this case. It is found in 74 *Del. Laws* c. 90. First, it added a separate civil penalty for failure to wear a seat belt. More pertinent, however, is that it added this provision:

(j) Notwithstanding any law to the contrary, any police officer is authorized to make an administrative stop for pur-

poses of enforcing this section, upon reasonable and articulable suspicion that a violation of this section has occurred.[21]

These changes became effective June 30, 2003. They were part of what was House Bill 43 (as amended) and the synopsis to that bill is germane to the issues arising in this case. That synopsis provided:

> Recently, Delaware has experienced an increase in motor vehicle fatalities. In many cases, the persons killed were not wearing seat belts. Delaware has also witnessed a decline in seat belt compliance.
>
> In an effort to increase seat belt compliance, thereby saving lives, this legislation establishes as a primary offense failure to wear a seat belt. As such, Delaware law enforcement officers will be able to lawfully stop motor vehicles based upon the non-use of a seat belt by an occupant of the passenger compartment of a motor vehicle. The legislation also allows for the assessment of points for such violations. Other states that have enacted primary seat belt laws have seen a corresponding increase in seat belt compliance.

In short, failure to wear a seat belt was moved from a "secondary" offense leading only to an aggravated assessment on the underlying violation, to a primary offense where a civil penalty is imposed. But since June 30, 2003, the police are empowered to make a stop for failure to wear a seat belt. Of course, the penalty is civil, but their authority is clear. And the ability to make such a stop is founded on the General Assembly's specific finding of an increase in motor vehicle fatalities.

■ The car in which Adams was a passenger was not stopped for a seat belt offense involving Adams but for a moving violation by the driver. This Court has held the stop of the vehicle in which Adams was a passenger was valid and did not violate any constitution rights of the driver. But the issue remains whether the police action involving Adams passes its own constitutional muster.

The answer to that comes from the facts in this case and from the United States Supreme Court. The factual background is that the car was lawfully stopped. As the police approached Adams, he made movements, manifesting what they believe was an attempt (of an intent) to flee. It is unclear if he fully got out of the car on his own or while getting out was pulled out or ordered to get out. Once he was out, the drugs were visible on the floorboard in front of him. Probable cause existed then to arrest. All of this was in a brief period of time. Based on that, his moves and the probable cause to arrest, no detention questions, or formalities were needed. A very brief stop was not elongated into a subsequent prolonged investigation at the scene of the traffic stop. His arrest and seizure of the drugs from the car were lawful.[22]

To underscore the propriety of the police action here is the United States Supreme Court case of *Maryland v. Wilson* where there are some striking similarities to this case.[23] In that case, the Maryland State Police stopped a car on I–95 for not having a regular tag. There were two passengers in the car. They looked at the officer and looked down. After the stop, the driver appeared nervous, and Wilson, one of the passengers, also appeared ner-

---

21. 21 *Del. C.* § 4802(j).

22. *See Watson v. State,* 892 A.2d 366 (Del. 2005).

23. 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997).

vous and was sweating. The trooper ordered Wilson out of the car and while doing so cocaine fell to the ground off his lap. The Supreme Court upheld the right of the officer to order Wilson out of the car. In doing so it said:

> We must therefore now decide whether the rule of [*Pennsylvania v.*] *Mimms* [434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) ] applies to passengers as well as to drivers. On the public interest side of the balance, the same weighty interest in officer safety is present regardless of whether the occupant of the stopped car is a driver or passenger. Regrettably, traffic stops may be dangerous encounters. In 1994 alone, there were 5,762 officer assaults and 11 officers killed during traffic pursuits and stops. In the case of passengers, the danger of the officer's standing in the path of oncoming traffic would not be present except in the case of a passenger in the left rear seat, but the fact that there is more than one occupant of the vehicle increases the possible sources of harm to the officer.
>
> On the personal liberty side of the balance, the case for the passengers is in one sense stronger than that for the driver. There is probable cause to believe that the driver has committed a minor vehicular offense, but there is no such reason to stop or detain the passengers. But as a practical matter, the passengers are already stopped by virtue of the stop of the vehicle. The only change in their circumstances which will result from ordering them out of the car is that they will be outside of, rather than inside of, the stopped car. Outside of the car, the passengers will be denied access to any possible weapons that might be concealed in the interior of the car passenger compartment. It would

seem that the possibility of a violent encounter stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of more serious crime might be uncovered during the stop. And the motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver.[24]

There is no evidence in this record that Adams appeared nervous or was "furtively" looking back and forth to the officers at the car stop scene. Their approach to him was proper. He was not wearing a seat belt, and that is against the law. His perceived attempt to flee provided a basis for him to be ordered out of the car. It is possible that he was only trying to get out on his own and not flee. Whichever version is accurate, once out or in the process of getting out the drugs were in plain view.

In sum, the police action at the car stop scene at 6th and Franklin Streets was proper and not violative of any constitutional rights, federal or state. That portion of Adams' motion to suppress is **DENIED.**

### B

■ The car stop and prior surveillance, of course, provided the basis for the search warrant for 1903 W. 8th Street, Adams' residence. For clarity of analysis it is desirable to restate the probable cause provided to the Justice of Peace to obtain the search warrant:

1) Your affiants are Detective Mitchell Rentz and Detective Andrea Janvier, both sworn member of the Wilmington Department of Police, are assigned to the Drug Organized Crime and Vice Division. Your affiants

---

**24.** 519 U.S. at 413–14, 117 S.Ct. at 885–86, 137 L.Ed.2d at 47–48.

have over 19 years of police experience. Your affiants have authored and/or coauthored in over fifty search warrants. Your affiant has arrested over one hundred drug offenders leading to numerous drug convictions. Your affiants have attended numerous schools dealing in the illegal distribution of controlled substances as well as the preferred methods of drug traffickers.

2) Your affiants can state that during the second week of October 2007 a confidential informant advised that a black male known possible as "Tarmel" sells cocaine from within 1903 w. 8th Street, Apartment # 1, Wilmington, Delaware. This individual is also known to frequent the area of 8th and N. Jefferson Street, or the 600 block of W. 8th street, Wilmington.

3) Your affiants can state that on numerous occasions during second, third week of October and the first two weeks of November 2007 visual surveillance was set up in the described area. A black male approximately 5'08, 170–180 with muslim beard and bald head, and frequently wears a kufe (* *muslim garb) was observed traveling from the 600 block of w. 8th street, directly to 1903 N. Lincoln Street, apartment # 1. This individual would enter the dwelling and return within 3–10 minutes. Often he would be driven by different females, who stayed in their vehicles. On other occasions he would occupy rental vehicles.

4) Your affiants can state that a deljis check was conducted for the nickname of "Tarnel". The only one was identified as Sean McKenzie, bmn 03–10–1971.

5) On 14 November 2007 your affiants along with assisting units set up visual surveillance on 1903 w. 8th street, apartment # 1. At approximately 2038 hours a grey in color Hyundai bearing Maryland registration 6BYE75 pulled into the 1900 block of w. 8th street. A black male wearing dark clothing, with a black kufe on his head exited the passenger side of this vehicle and responded in with keys to 1903 w. 8th street, apartment # 1. At approximately 2047 hours this male exited the dwelling and re-occupied the passenger seat of the vehicle.

6) Your affiants can state that as the described vehicle pulled into the flow of traffic from a parked position she did not signal. Further, the front seat passenger did not have a seatbelt on. Assisting units with emergency equipment came to assist. At approximately 2052 hours a motor vehicle stop was conducted at 6th and n. franklin street. The passenger identified as steven adams, bmn 06–24–1974 opened the door of the vehicle and put his right arm in the passenger floorboard area. He then looked as if he was going to run. He was placed into custody. In plain view on the described floor board area a clear knotted bag was located containing a tan, chunky substance to wit crack-cocaine (*later field tested positive with a approximate weight of 7.5 grams, further a small knotted bag containing marijuana was located (* *field tested positive with an approximate weight of 1.0 grams). The operator of the vehicle was identified as Natisha Winder, bfn 07–14–1975. Her son Marquis Carpenter, bmn 06–07–1999 was a rear seat passenger.

7) It should noted that Steven Adams has an address of 1903 w. 8th street, apartment # 1 his ID card. Further, as of June 20, 202 he is a convicted

drug felon. He was found guilty of possession of a schedule II narcotic within 300 ft of a park.

8) Your affiants can state that units immediately responded to the described residence to conduct continued surveillance while these investigators applied for said search warrant.[25]

The key issue is whether there is a sufficient nexus between the activities described and probable cause to search Adams' residence. Several cases of this Court demonstrate there was an insufficient nexus.

In Delaware, the right of citizens to be free from unreasonable searches and seizures is secured by both Article I, § 6 of the state Constitution and the 4th Amendment of the United States Constitution.[26] Requirements for the issuance of a search warrant are codified in 11 *Del. C.* § 2306 which states:

The application or complaint for a search warrant shall be in writing, signed by the complainant and verified by oath or affirmation. It shall designate the house, place, conveyance or person to be searched and the owner or occupant thereof (if any), and shall describe the things or persons sought as particularly as may be, and shall substantially allege the cause for which the search is made or the offense committed by or in relation to the persons or things searched for, and shall state that the complainant suspects that such persons or things are concealed in the house, place, conveyance or person designated and shall recite the facts upon which such suspicions is founded.

 Delaware courts have interpreted this section, coupled with 11 *Del. C.* § 2307,[27] to impose a "four corners" test for probable cause.[28] This test requires the affidavit to include "adequate facts to allow a reasonable person to conclude that an offense has been committed and that seizable property would be found in a particular place or on a particular person." [29] This is so the reviewing magistrate can "make an independent evaluation of matter" in determining whether probable

**25.** Affidavit of Probable Cause.

**26.** Del.C.Ann. Const., Art. 1, § 6; U.S.C.A. Const. Amend. IV.

**27.** § 2307. Issuance contents; execution and return of search warrants.

(a) *Issuance of search warrants; contents.*—If the judge, justice of the peace or other magistrate finds that the facts recited in the complaint constitute probable cause for the search, that person may direct a warrant to any proper officer or to any other person by name for service. The warrant shall designate the house, place, conveyance or person to be searched, and shall describe the things or persons sought as particularly as possible.

(b) *Execution and return with inventory.*—The officer taking property under the warrant shall give to the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property taken or shall leave the copy and receipt at the place from which the property was taken. The return shall be made forthwith and shall be accompanied by a written inventory of any property taken. The inventory shall be made and signed by the officer executing the warrant in the presence of the person from whose possession or premises the property was taken, if they are present, or if they are not present, in the presence of at least 1 witness. The judge shall upon request deliver a copy of the inventory to the person from whom or from whose premises the property was taken and to the applicant for the warrant.

11 *Del. C.* § 2307.

**28.** *Pierson v. State,* 338 A.2d 571, 573–74 (Del. 1975).

**29.** *State v. Cannon,* 2007 WL 1849022 (Del.Super.) at *3.

cause exists.[30] An affidavit establishes probable cause to search only where it contains a nexus between the items sought and the place to be searched.[31] From this emerges the necessity of a two-fold factual proffer to establish probable cause to search: (1) probable cause that a crime was committed; and (2) probable cause to believe that evidence of that crime will be found at the residence.[32]

▆▆▆▆ On review, the Court is to make a common sense determination of whether an affidavit afforded the issuing magistrate a "substantial basis" upon which to determine probable cause to search existed.[33] Further, a reviewing court will give great deference to the decision of the issuing magistrate.[34]

The State relies upon *State v. Church*[35] as support for its argument that the probable cause here provided sufficient nexus for the search of Adams' residence. In that case, like here, a subsequent search, with a warrant, was undertaken after a warrantless arrest on the street. Church challenged the warrant on the basis that there was insufficient probable cause presented to obtain a warrant to search his residence.

The Court in *Church* summarized that probable cause: (1) a past proven reliable informant said a black male (street name given) was selling large amounts of drugs from his house on 2nd Street, (2) Church and another male were seen leaving the 2nd Street address and going to a Gray Avenue address where Church checked his mail, entered, left and drove to a local restaurant to conduct a probable drug sale (described in detail elsewhere in the opinion), (3) Church's car and a pick-up were seen at the 2nd Street and Gray Avenue locations on a daily basis, (4) Church was seen going from Gray Avenue to 2nd Street leading the police to believe the Gray Avenue location was where he kept his stash, and (5) Church was seen leaving the Gray Avenue address and going to the 2nd Street address with empty duffel bags but then leaving the 2nd Street address with those bags full. The affidavit also provided the officers' opinions about drug traffickers generally living at one location and keeping the stash at another.

This Court found this probable cause sufficient to get a warrant for both locations.

Comparison of *Church* to this case does not help the State: (1) the informant here was not past or proven, (2) the seller described by the informant was not Adams, (3) there was no drug transaction observed in which Adams' was a participant, and (4) he was never seen at any time transporting anything that could be considered as containing drugs from the residence.

This case is close to *State v. Ada*[36] where this Court found an insufficient nexus in the affidavit of probable cause after a street arrest and a subsequent search of Ada's apartment at 2724 West 4th Street in Wilmington. The court set out the probable cause and its findings as follows:

> The affidavit in support of the search warrant for 2724 West 4th Street pro-

---

30. *Blount v. State*, 511 A.2d 1030, 1033 (Del. 1986).

31. *Hooks v. State*, 416 A.2d 189, 203 (Del. 1980).

32. *Id.* citing *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir.1983).

33. *Jensen v. State*, 482 A.2d 105, 111 (Del. 1984).

34. *Blount*, 511 A.2d at 1030.

35. 2002 WL 31840887 (Del.Super.).

36. 2001 WL 660227 (Del.Super.).

vides that police conducted visual and video surveillance of the residence. Police witnessed Defendant coming and going from the residence and observed Defendant use a key to enter and lock the front door of the residence. Defendant was once observed leaving the residence with gym bag and was followed to the area of the Lancaster Avenue apartment. The affidavit also provides:

> Your affiants then believed that [Defendant] may be keeping the main portion of his drugs at 2724 W. 4th St. While he sold out of the apartment at 3201 Lancaster Ave. Apt C–4. Your affiants are very familiar with drug dealers who often keep their main supply location separate [sic] from their sales location. This is commonly done to protect [sic] the dealers [sic] larger quantity of drugs in case the police execute a search warrant at the sales location.

The affidavit also provided that police had been provided with information from Officer Collins that Deptula was "possibly selling drugs" for a subject who lived in the 2400 block of West 4th Street. Based on their prior observation of Deptula at the Lancaster Avenue apartment complex, police believed that Deptula worked for defendant.

The State argues that, based upon the above cited information, it was reasonable to infer that Defendant would store drugs and related material in the 4th Street residence. Upon review of the affidavit in support of the search warrant at issue, the Court cannot find that the search warrant and supporting affidavit provide sufficient probable cause to search the residence at 2724 West 4th Street.[37]

*Ada* virtually mirrors this case. The address given in part of the affidavit was the 2400 block of West 4th Street. Yet the defendant lived at 2724 West 4th Street. As here, there was no suspicious or obvious drug sale or transport of something containing drugs as in *Church*. The police here, in good faith, nevertheless, failed to provide in the affidavit a sufficient nexus to what happened at 6th and Franklin Streets, their surveillance, the informants's tip to being able to search for drugs at Adams' residence at 1903 W. 8th Street.

Therefore, Adams' motion to suppress the items seized as a result of that search is **GRANTED**.

In *Dorsey v. State*,[38] the Supreme Court declined to recognize that Delaware Constitutional law provided for a good faith exception to the exclusionary rule. This Court has previously explained why the rationale for that result is, respectfully, misplaced if not incorrect.[39] Nevertheless, *Dorsey*, of course, remains the law.

## II

Since the Court has held the search warrant for 1903 W. 8th Street lacked probable cause and the evidence seized as a result of it is suppressed, there is no need to address the remaining issue of the nighttime search. The warrant was authorized at 9:59 p.m. The officers waiting at 1903 were so informed and entered it to "secure" it. No search was undertaken, they said. The actual search began around 10:15 p.m. when the affiant officers arrived and started the search.

Adams' challenge to the search is based on 11 *Del. C.* § 2308 which regulates nighttime search warrants:

37. *Id.* at *5.

38. 761 A.2d 807 (Del.2000).

39. *State v. Henderson*, 906 A.2d 232, 246–48 (Del.Super.).

A search warrant shall not authorize the person executing it to search any dwelling house in the nighttime unless the judge, justice of the peace or magistrate is satisfied that it is necessary in order to prevent the escape or removal of the person or thing to be searched for, and then the authority shall be expressly given in the warrant. For purposes of this section the term "nighttime" shall mean the period of time between 10:00 p.m. and 6:00 a.m.

Curious, did the "execution" begin at 9:59 p.m. when the entering officers were told the warrant was authorized or at 10:15 p.m. or when the actual search began. The initial entering officers had no exigent circumstances or other authority to enter except an authorized warrant.

The State has cited *Jones v. State*[40] as support for its argument that the search here began at 9:59 p.m.

In this case, this Court does not have to address that novel issue of Delaware law.

### Conclusion

For the reasons indicated herein, Defendant Steven Adams' Motion to Suppress is DENIED, in part, and GRANTED, in part.

40. 128 P.3d 521 (Okla.Crim.App.2006).