Mark RIVERA, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 111, 2010.

Supreme Court of Delaware.

Submitted: Sept. 8, 2010.
Decided: Nov. 10, 2010.

Ronald G. Poliquin, Esquire, of Chasanov, Schaeffer & Poliquin, Dover, Delaware, for Appellant.

John Williams, Esquire, Department of Justice, Dover, Delaware, for Appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER and JACOBS, Justices, and NOBLE, Vice Chancellor,[1] constituting the Court en Banc.

JACOBS, Justice:

Mark Rivera ("Rivera"), the defendant below, appeals from a Superior Court final

---

1. Sitting by designation pursuant to DEL. CONST. art. IV, § 12, DEL. SUP.CT. R. 2(a) and DEL. SUP.CT. R. 4(a).

judgment of conviction for first-degree murder.[2] On appeal, Rivera claims that the Superior Court erroneously denied his motion to suppress evidence found during a search of a motor vehicle, and improperly restricted his psychiatric expert witness' testimony at trial. We find no merit to these claims and affirm.

### FACTUAL AND PROCEDURAL HISTORY

On Monday afternoon, October 8, 2007, Christine Pate's body was discovered floating in the Leipsic River. Police recovered the body, which was covered in dark mud, approximately ten miles from her trailer home located at 16 Pinewood Acres in Dover, Delaware ("Pinewood Acres"). Pate had recently moved to Pinewood Acres to live with her childhood friend, Deanna Hall, who previously lived there with her then-husband, Mark Rivera. After Rivera and Hall divorced, Rivera moved out.

The medical examiner's ("ME") report showed that Pate had significant bruising on the right side of her face, abrasions on her forehead, several damaged teeth, and a hemorrhage on her scalp that covered the right side of her head. The ME report determined that the cause of death was asphyxiation due to drowning, complicated by multiple blunt force trauma to the head. At trial, the ME testified that the manner of death was homicide, and that Pate's injuries were consistent with an attack by a left-handed person.

The Delaware State Police ("DSP") launched an investigation into Pate's death. DSP Detectives Michael Maher and William Porter interviewed Derrick Davis, who was Pate's boyfriend at the time. Davis told the police that he and Pate had spent the weekend at the beach and that he had last seen Pate on Sunday, October 7th, around 11:30 p.m., when he left to return home. Davis also informed the police that Rivera had previously made sexual advances to Pate.

Detective Maher also interviewed Michael Reese, a neighbor who had lived next door to Hall and Rivera for more than a year before Rivera moved out in August 2007. Reese told Maher that on the night of October 7th, he had been sleeping, and was awakened at around 1:00 a.m. by loud banging noises. When Reese looked out his window, he saw a man who fit Rivera's physical description carrying a small female in a bear hug out the front door of Hall's trailer.[3] The man dropped the female on the front step, and then dragged her around to the side of the trailer. Days later, the DSP asked Reese to give a formal interview and identify from a photographic array the man he had seen. Reese was unable to identify Rivera specifically from the photo lineup. Reese did, however, ask Maher whether the police were investigating "the guy who lived next door," because he believed that the man he saw was his neighbor, Rivera. At trial Reese positively identified Rivera as the man he saw dragging the female body down the front steps of the Pinewood Acres trailer.

Detective Maher also interviewed Hall. Hall told Maher that her relationship with Rivera ended, in part, because he had become physically violent towards her during his parasomnia (i.e., "sleep terror") episodes.[4] Initially, Rivera's episodes were

---

2. 11 Del C. § 636.

3. Reese also told the police that he had seen a second man watching TV inside the Pinewood Acres trailer. The police affidavit, however, did not mention this second man.

4. Parasomnias, or sleep terrors, are a type of sleeping disorder. Michael A. Cramer Bornemann, M.D., et al., *Parasomnias: Clinical Features & Forensic Implications*, 130 CHEST 605 (2006). According to one scientific study,

rare and non-violent, but towards the end of their marital relationship, the episodes became more frequent. Hall believed that Rivera was faking his sleep terrors and was using them as an excuse to hurt her.[5] After she divorced, Hall started dating Pate's brother. Hall informed Detective Maher that Rivera would repeatedly contact Pate in an effort to learn more information about Hall.

The day after Pate's body was recovered, DSP Detective Mark Papili and Captain John Evans interviewed Rivera at his Camden, Delaware residence. While there, Detective Papili noticed that Rivera had a 1997 Pontiac Grand Am. When asked about the car, Rivera insisted that he was the only person who used it, and that he never let anyone borrow it. A DELJIS inquiry revealed, however, that the car was registered to Hall. While interviewing Rivera, Papili noticed several fresh lacerations on Rivera's left hand.[6] Detective Papili requested assistance from Detective Robert Daddio, the DSP troop's evidence technician, who arrived and photographed Rivera's hand. Papili also asked Rivera about his whereabouts on the night of October 7th. Rivera replied that he had been at home sleeping, but he could not identify any witnesses who could confirm his story.

Detective Daddio also investigated the Pinewood Acres trailer. Inside the trailer, Daddio discovered blood spots, part of a tooth on the linoleum flooring, as well as hair clumps on the trailer steps. A DNA analysis of the blood spots matched Pate's DNA profile, indicating that she was likely attacked by, and struggled with, her assailant. According to the ME, Pate's blunt force injuries were not fatal, and Pate would have possibly survived had she received medical attention shortly after she suffered her injuries.

Based on the ME report, the distance of Pate's body from the crime scene, Reese's statements to the police, the evidence of a struggle at the trailer, the lacerations observed on Rivera's left hand, and Hall's statements about Rivera's aggressive nature, Detective Maher applied for a warrant to search Rivera's car. The search warrant application was granted on October 11, 2007. A search of the Grand Am revealed dirt and mud on the passenger seat, as well as blood samples. Paul Gilbert, a forensic DNA analyst at the ME's office, conducted laboratory tests on the blood samples, and testified at trial that there was a high probability that the samples matched Pate's DNA profile. Based on that evidence, Rivera was arrested and charged with first-degree murder.

Before trial, Rivera moved to suppress the evidence found during the search of the Grand Am, claiming that the police lacked sufficient probable cause. At an evidentiary hearing held on December 3, 2009, the trial judge, after considering the search warrant application and hearing testimony from Detective Maher, denied Rivera's suppression motion.

As part of his trial defense, Rivera sought to introduce expert testimony about his parasomnias. On June 1, 2009, he underwent a sleep study conducted by two

---

nearly 2% of the adult population has reported violent behaviors arising from sleep terrors. *Id.* at 606; *see also Arizona v. Falater*, No. CR1997–000928–A (Ariz.Super.Ct. Maricopa County 1997) (defendant was charged with first-degree murder after stabbing his wife 44 times and then drowning her; defendant asserted a sleepwalking defense on the basis that he had a history of sleepwalking, was sleep-deprived, and was unconscious at the time of the attack).

5. Hall told the police that during Rivera's alleged sleep terrors, he would grab her by the throat, or slam her into the door.

6. Rivera is left-handed.

doctors at the Christiana Hospital. The results of that study did not reveal any sleep terror episodes. Rivera then retained Dr. Burton T. Mark as his expert witness. Dr. Mark prepared a report based on his review of the June 1st sleep study, Hall's initial investigation statements to Detective Maher, statements from witnesses who lived near Rivera, a statement from Rivera's cellmate, Craig Coleman, and Rivera's own statement specially prepared for Dr. Mark's review. Dr. Mark did not, however, conduct an independent examination of Rivera. In his report, Dr. Mark concluded that he believed Rivera suffered from sleep terrors.

The State then moved *in limine* to preclude Dr. Mark from testifying at trial about Rivera's state of mind at the time of the killing. Ruling on that motion, the trial judge held that Dr. Mark could testify about his conclusions about Rivera's parasomnias, but would not be permitted to opine about whether Rivera was experiencing a sleep terror when Christine Pate was killed.

A five-day jury trial was held in Superior Court from December 7, 2009 through December 15, 2009. Rivera did not testify. At the close of the trial, the jury found Rivera guilty of first-degree murder. This appeal followed.

## ANALYSIS

### I. *The Motion to Suppress*

Rivera first claims that the Superior Court erred by failing to grant his motion to suppress the evidence found during a search of his motor vehicle. He advances two separate grounds. First, Rivera contends that the trial judge found probable cause for the search in reliance on an erroneous conclusion that Hall was a missing person. Second, Rivera argues that the police misled the magistrate by recklessly omitting several exculpatory facts that, if included, would have undermined the finding of probable cause.

■ This Court reviews a trial court's denial of a motion to suppress after an evidentiary hearing for abuse of discretion.[7] The trial court's formulation and application of legal concepts are reviewed *de novo*,[8] but the trial court's factual findings will be upheld so long as they are not clearly erroneous.[9]

### A. *The Probable Cause Standard*

■ Search warrants are issued only upon a showing of probable cause.[10] An affidavit submitted in support of a search warrant application must set forth facts that, within the affidavit's four corners, are sufficient for a neutral magistrate to conclude that "a crime has been committed and that the property sought to be seized would be found in a particular place."[11] In determining whether probable cause exists, the magistrate must apply a "totality of the circumstances" test to decide if "there is a fair probability that contraband or evidence of a crime will be found in a

---

7. *Donald v. State*, 903 A.2d 315, 318 (Del. 2006) (citing *Norcross v. State*, 816 A.2d 757, 762 (Del.2003)).

8. *Id.*

9. *Cooke v. State*, 977 A.2d 803, 854 (Del.2009) (citing *Lopez–Vazquez v. State*, 956 A.2d 1280, 1285 (Del.2008) and *Chavous v. State*, 953 A.2d 282, 286 n. 15 (Del.2008)).

10. *Morgan v. State*, 962 A.2d 248, 252 (Del. 2008) (citing *LeGrande v. State*, 947 A.2d 1103, 1107 (Del.2008)); *Fink v. State*, 817 A.2d 781, 786 (Del.2003).

11. *Blount v. State*, 511 A.2d 1030, 1032–33 (Del.1986) (holding that probable cause exists "when a nexus appears between the items being sought and the place to be searched.").

particular place." [12] In so doing, the magistrate may draw reasonable inferences from the affidavit's factual allegations.[13]

■ This Court reviews a magistrate's determination of probable cause "with great deference," [14] because "[a] grudging or negative attitude by reviewing courts toward warrants is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant." [15] Although this Court will not "simply rubber stamp a magistrate's conclusions," [16] our review need only ensure that the magistrate had a substantial basis for finding that probable cause existed.[17] Where the facts are not disputed, our review of the trial court's application of the probable cause standard is de novo.[18]

### B. The Allegedly Erroneous Probable Cause Finding

■ Rivera first argues that the trial court erroneously denied his suppression motion based on its "own erroneous conclusion" that Hall, who owned the 1997 Grand Am, was a missing person, even though in fact she was not. Because the trial court's probable cause finding rests on that erroneous conclusion about Hall, Rivera contends, the trial court abused its discretion in refusing to suppress the evidence discovered during the search of his car.

We disagree. The trial court did not base its finding of probable cause on whether Hall was a missing person. Rather, the trial judge expressly found that the search warrant affidavit's "four corners" contained sufficient facts to warrant a finding of probable cause. In particular, the affidavit recited that Rivera was in possession of the Grand Am, and that when the police ran a DELJIS inquiry, that car came up as being registered to his ex-wife, Hall. Pate and Hall were roommates at Pinewood Acres, and Rivera had contacted Pate repeatedly to get information about his ex-wife. After recovering Pate's body in the Leipsic River, the police went to the Pinewood Acres trailer and found broken jewelry, blood, a broken tooth, and hair belonging to Pate, all indicating that she had struggled with her assailant. When the police interviewed Rivera the day after Pate's body was found, they noticed fresh lacerations on the knuckles of his left hand. Rivera's injuries were consistent with the medical examiner's report indicating that Pate's injuries, which occurred on the right side of her head, were caused by a left-handed person. The affidavit also disclosed that Rivera fit the physical description of the man Hall's neighbor, Reese, saw on the night of Pate's attack.

Viewing these facts in the totality of the circumstances, the trial judge held that there was sufficient probable cause to justify a search of the Grand Am. The judge determined that there was a fair probability that the police would recover evidence of the crime, such as blood, hair, fibers, or

---

12. *Sisson v. State*, 903 A.2d 288, 296 (Del. 2006) (citations omitted).

13. *Id.*

14. *Smith v. State*, 887 A.2d 470, 473 (Del. 2005) ("We review a probable cause determination in the issuance of a search warrant with great deference, considering it as a whole and 'not on the basis of a hypertechnical analysis of its separate allegations.' " (quoting *Blount*, 511 A.2d at 1034)).

15. *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

16. *Sisson*, 903 A.2d at 296 (quoting *United States v. Zimmerman*, 277 F.3d 426, 432 (3d Cir.2002)).

17. *Id.*

18. *Id.*; *Smith*, 887 A.2d at 473.

fingerprints, from the Grand Am, especially since Pate's attacker likely used a vehicle to transport her body to the river. This determination did not rest on Hall being a missing person. But, even if the trial judge mistakenly confused Pate as the owner of the Grand Am, or incorrectly thought that Hall was a missing person, the court did not rely on those conclusions in finding probable cause. Therefore, Rivera's first claim of error fails.

### C. *The Omitted Exculpatory Facts*

Rivera's second claim of error is more troubling. Relying on *Franks v. Delaware*, he contends that the police recklessly omitted several exculpatory facts from the search warrant affidavit.[19] Had those facts been included, Rivera urges, the magistrate would have been unable to find probable cause. According to Rivera, the search warrant affidavit should have included the following exculpatory facts: (1) Reese had seen two men at Pinewood Acres when the female body was being dragged out; (2) after Reese gave the police his statement, he was unable to identify Rivera in a photo lineup; (3) Davis's statements about Rivera making sexual advances to Pate were based on conduct that had occurred months before her death; and (4) Davis was the last person seen with Pate just hours before her death.

1. *What is the appropriate standard of review?*

■ This Court has previously characterized this type of claim as a "reverse-*Franks* situation." In *Sisson v. State*, we held that "[i]f the police omit facts [from a search warrant affidavit] that are material to a finding of probable cause with reckless disregard for the truth, then the rationale of *Franks v. Delaware* applies," and the evidence obtained as a result of that search warrant must be suppressed.[20] To succeed on a reverse-*Franks* claim, a defendant must show by a preponderance of the evidence that the police knowingly and intentionally, or with reckless disregard for the truth, omitted information from the search warrant affidavit that was material to a finding of probable cause.[21]

■ The Third Circuit has developed a two-pronged approach for analyzing reverse-*Franks* claims. First, the court must determine whether the omissions were made with reckless disregard.[22] According to the Third Circuit, "omissions

---

**19.** *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). In *Franks*, the defendant challenged a search warrant affidavit on the basis that it contained inaccurate facts. *Id.* The United States Supreme Court held that where a defendant shows by a preponderance of the evidence that a false statement necessary for the finding of probable cause was made "knowingly and intentionally, or with reckless disregard for the truth," then the evidence obtained from that search warrant must be excluded. *Id.*

**20.** *Sisson v. State*, 903 A.2d 288, 300 (Del. 2006) (quoting *Smith v. State*, 887 A.2d 470, 472 (Del.2005)); *see also Blount v. State*, 511 A.2d 1030, 1034 (Del.1986) ("Although the *Franks* decision dealt with misstatements in-

cluded in probable cause affidavits, the Superior Court ... and several other courts have concluded that the *Franks* rationale is also to be applied to omissions of facts which are material to a finding of probable cause.").

**21.** *Sisson*, 903 A.2d at 300; *Smith*, 887 A.2d at 472. Here, defense counsel conceded at oral argument that there was no evidence that the police acted "knowingly and intentionally" and, therefore, we need only address the "reckless disregard for the truth" prong of *Franks*.

**22.** *Reedy v. Evanson*, 615 F.3d 197, 213 (3d Cir.2010); *Wilson v. Russo*, 212 F.3d 781, 787–88 (3d Cir.2000); *see Sisson*, 903 A.2d at 300.

are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know" in making a probable cause determination.[23] As the Second Circuit stated in *Rivera v. United States*, "recklessness may be inferred where the omitted information was 'clearly critical' to the probable cause determination." [24]

If reckless disregard is shown, the court must then address the second prong of the inquiry and determine whether the omissions were "material, or necessary, to the finding of probable cause." [25] To determine whether an omission is "material to a finding of probable cause," the reviewing court must reconstruct the affidavit to include the newly added information, and then decide whether the "corrected" affidavit would establish probable cause.[26]

Although the Third Circuit would apply its two-pronged approach sequentially,[27] in our view the two prongs need not be addressed in that precise order, because we perceive no meaningful distinction between the "materiality" standard articulated by the Third Circuit, and the objective "reckless disregard" standard of "what a reasonable magistrate would want to know." Stated differently, a reasonable magistrate would want to know any fact that is material. Therefore, the materiality inquiry may proceed first, before addressing whether the police acted with "reckless disregard." If a defendant cannot show by a preponderance of the evidence that the omitted information was material, then it does not matter whether the police made those omissions with "reckless disregard." We apply this approach to Rivera's claim.

### 2. *Were the omitted facts material?*

 We first address whether the exculpatory facts Rivera points to are omissions that are "material to a finding of probable cause." That requires us to reconstruct the affidavit with the newly added information, and then decide whether the "corrected" affidavit would either establish—or undermine—the existence of

---

**23.** *Wilson*, 212 F.3d at 783.

**24.** *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir.1991). In *Rivera*, the court concluded that the police may properly exclude information regarding a confidential informant's identity in order to prevent exposing the informant to harm. *Id.* at 604–05 ("So long as law enforcement agents present adequate information to permit the magistrate to conclude that there is probable cause and do not suppress facts that would cast doubt on its existence, they may properly exclude information that would unduly risk revealing a confidential informant's identity and exposing him or her to harm."). The police may not, however, omit information to enhance the contents of the affidavit. *Id.* (citing *United States v. Strini*, 658 F.2d 593, 597 (8th Cir.1981) (holding that a failure to reveal an informant's identity is not a false statement within the meaning of *Franks* where the omission was intended not to enhance the contents of the affidavit, but to protect the informant)).

**25.** *Wilson*, 212 F.3d at 789 (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir.1997)); *see also Reedy*, 615 F.3d at 213; *Sisson*, 903 A.2d at 300.

**26.** *Sisson*, 903 A.2d at 300; *Smith*, 887 A.2d at 472 ("The omitted information is then added to the affidavit so that the existence or absence of probable cause can be re-evaluated."). *See also Reedy*, 615 F.3d at 213–23 (applying the *Franks* analysis for omitted facts in a § 1983 case for false arrest); *United States v. Eberle*, 266 Fed.Appx. 200, 204–06 (3d Cir.2008) (applying the *Franks* analysis for omitted facts in an appeal from a denial of a suppression motion); *Wilson*, 212 F.3d at 787–92 (defining "materiality").

**27.** *See, e.g., Reedy*, 615 F.3d at 213; *Eberle*, 266 Fed.Appx. at 205; *Wilson*, 212 F.3d at 789.

probable cause.[28]

Having considered the corrected affidavit, we conclude that the exculpatory facts Rivera points to, when viewed as part of the totality of the circumstances, do not suffice to undermine the finding of probable cause. As the trial judge accurately noted, the police utilized "much more than Reese's statement to obtain the search warrant." The "original" affidavit sets forth multiple independent facts, i.e., Rivera being left-handed and the injuries to his left hand, Pate's injuries to her right side that were consistent with an attack by a left-handed person, evidence of a struggle at Pinewood Acres, the distance from Pate's Pinewood Acres trailer to where her body was recovered, and Rivera's possession of Hall's car. Those facts are sufficient to establish a fair probability that the police would recover evidence of the crime during a search of the Grand Am, because Pate's attacker most likely used a vehicle to move her body from Pinewood Acres to the river. Such evidence could include blood, hairs, fibers, or fingerprints. The "corrected" affidavit also supports a finding of probable cause, because the omitted exculpatory facts do not undermine or contradict the facts in the "original" affidavit that show a fair probability of recovering evidence of the crime from the Grand Am. Therefore, the omitted facts cannot be "material," and we need not address whether the police acted with "reckless disregard." The trial court did not err in denying Rivera's suppression motion.

We note, however, that this case presents a close call. To be sure, an affidavit need not contain "the entire history of events leading up to a warrant application with every potentially evocative detail that would interest a novelist or gossip," and the police must exercise a degree of selectivity in deciding what facts to include in a warrant application.[29] Nevertheless, we caution that "a police officer cannot make unilateral decisions about the materiality of information, or, after satisfying him or herself that probable cause exists, merely inform the magistrate or judge of inculpatory evidence."[30] Likewise, if police rely on facts of which they have personal knowledge, they should disclose those facts to the magistrate by including them in the affidavit.[31]

Here, the police did not follow those procedures. For example, paragraph 13 of the affidavit recites that additional facts were known to the police. Those facts were not set forth in the affidavit. During the suppression hearing, Detective Maher testified that after he had shown Reese the photo array, Reese asked him whether the police had investigated the man who was living next door. Reese asked that question, because he thought his former neighbor fit the physical description of the man he saw coming out of Pinewood Acres carrying the female body on the night of Pate's death. Detective Maher also testified that his investigation revealed that the man who had previously lived next door to Reese was Rivera, and that no other man was then living next door. Maher omitted

28. See supra note 26 and accompanying text.

29. Wilson, 212 F.3d at 787.

30. Id.

31. Illinois v. Gates, 462 U.S. 213, 285 n. 6, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (Brennan, J., dissenting) ("When the police rely on facts about which they have personal knowledge, requiring them to disclose those facts to magistrates imposes no significant burden on the police."); see also Franks v. Delaware, 438 U.S. 154, 163–64, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) (noting that statements made in an affidavit that are within the personal knowledge of the affiant weigh towards the integrity of the affidavit).

from his affidavit that information about his conversation with Reese, and the results of his investigation. Had Maher included that additional information, it would have likely strengthened the finding of probable cause, because Reese's statements identifying the man he had seen dragging the female body out of Pate's trailer would have helped offset any adverse inference from Reese's inability to identify Rivera in the photo lineup. Nevertheless, because in all events the corrected affidavit supports a finding of probable cause, we find no error in the trial court's denial of Rivera's suppression motion.

## II. *The Expert Testimony*

Rivera also claims that the trial judge erred by improperly restricting the trial testimony of his psychiatric expert witness, Dr. Mark. Although the judge permitted Dr. Mark to testify that Rivera suffered from a history of parasomnias (sleep terrors), the judge did not permit Dr. Mark to testify that Rivera actually experienced sleep terrors on October 7, 2007, the night of Pate's attack. Rivera claims that Dr. Mark should have been permitted to opine about whether he (Rivera) suffered from a

sleep terror on the night he attacked Pate, because that opinion would negate the *mens rea* required to prove first-degree murder.

Although both parties rely on case law addressing this question under Delaware Rules of Evidence ("DRE") 704,[32] they inexplicably frame their arguments in terms of DRE 702.[33] The question is not whether Dr. Mark could testify as to whether Rivera suffered from sleep terrors on the night in question (the subject of DRE 704). Rather, it is whether Dr. Mark's testimony would be reliable under these circumstances (the subject of DRE 702). Accordingly, as an initial matter, an analysis under DRE 702 is required.

▮▮▮▮▮ DRE 702 governs the admissibility of expert testimony. To be admissible, expert testimony must be both relevant and reliable.[34] Under DRE 702, a trial judge acts as the "gatekeeper" in deciding whether an expert's testimony "is not only relevant, but reliable."[35] The trial judge must determine that the expert's methodology and ultimate conclusion are reliable "based on the methods and procedures of science, rather than subjec-

---

**32.** The parties cite to conflicting Superior Court case law in support of their respective positions. Rivera relies on *State v. Magner,* 732 A.2d 234 (Del.Super.Ct.1997), where that court concluded that under DRE 704, the defense expert could testify as to whether the defendant was acting under the influence of severe emotional distress at the time of the murder. *Id.* at 244–45. The State points to a contrary opinion by the Superior Court in *State v. Hodges,* 1996 WL 33655975 (Del.Super.Ct. Sept. 10, 1996), where the court held that, under DRE 704, "Delaware law requires the 'exclusion of expert testimony that expresses a legal conclusion.'" *Id.* at *2 (quoting *North Am. Philips Corp. v. Aetna Cas. & Sur. Co.,* 1995 WL 628447, at *3 (Del.Super.Ct. Apr. 22, 1995)). As a result, the *Hodges* court prohibited the expert witness from testifying as to whether the defendant "was

indeed suffering from extreme emotional distress." *Id.* at 245.

**33.** Since we affirm the trial court's exclusion of Dr. Mark's testimony under DRE 702, we do not need to address whether DRE 704 would provide a separate ground to exclude that expert testimony.

**34.** *M.G. Bancorporation, Inc. v. Le Beau, Inc.* 737 A.2d 513, 521 (Del.1999) (quoting *Daubert v. Merrell Dow Pharma.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)); *see also Price v. Blood Bank of Del., Inc.,* 790 A.2d 1203, 1210 (Del.2002).

**35.** *M.G. Bancorporation,* 737 A.2d at 521; *see also Bowen v. E.I. DuPont de Nemours & Co.,* 906 A.2d 787, 794 (Del.2006).

tive belief or speculation."[36] If the trial judge finds the expert testimony not reliable, that testimony is properly excludable under DRE 702.[37] We review a trial judge's decision to exclude expert testimony for abuse of discretion,[38] because trial judges, as gatekeepers, "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."[39]

Rivera's claim cannot succeed. At the December 3rd hearing, the trial judge ruled that Dr. Mark could testify as to Rivera's history of sleep terrors based on his expert review of statements by third parties who had observed Rivera's sleep, the June 1, 2009 sleep study, and Rivera's own statements. Dr. Mark was not, however, permitted to testify that Rivera "was experiencing a sleep terror at the time of the murder." That ruling was not an abuse of discretion. The record shows that Rivera did not suffer any "sleep terrors" during the June 1, 2009 sleep study, Dr. Mark had never physically examined Rivera, and Dr. Mark conceded at trial that he had never met or spoken with Rivera. The only basis on which Dr. Mark could have formed his expert opinion about

whether Rivera actually experienced a "sleep terror" on the night of October 7th would have been Rivera's own statements and statements from third parties, none of whom were qualified medical experts.[40] These statements, without more, cannot constitute "sufficient facts or data" upon which Dr. Mark could properly have based his medical diagnosis, as required by DRE 702.[41] Nor has Rivera shown that if Dr. Mark had based his medical diagnosis on these statements, that methodology would be "reasonably relied upon by experts in the field."[42] Therefore, the trial court properly exercised its discretion in excluding Dr. Mark's testimony about whether Rivera had actually suffered from a parasomnia the night of Pate's attack, because that testimony would not have been reliable.

Finally, Rivera cannot show that he was prejudiced by the trial court's ruling. Having chosen not to testify at trial, Rivera waived his right to give his account of what happened on October 7th. At trial, Dr. Mark did testify that he believed Rivera suffered from sleep terrors, and he did recount Rivera's version of the October 7th events. Dr. Mark testified that Rivera

---

**36.** *Price*, 790 A.2d at 1210 (quoting *In re TMI Litig.*, 193 F.3d 613, 669 (3d Cir.1999)).

**37.** *Id.*

**38.** *M.G. Bancorporation*, 737 A.2d at 522 ("[A]n appellate court must apply an abuse of discretion standard when 'it reviews a trial court's decision to admit or exclude expert testimony.'" (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997))).

**39.** *Garden v. State*, 815 A.2d 327, 338 (Del. 2003) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)), *superseded by statute on other grounds*, 11 *Del. C.* § 4209(d) (2003).

**40.** According to Dr. Mark's report, he reviewed statements from Craig Coleman (Riv-

era's cellmate), Hall, and other residents living near Rivera's home.

**41.** DEL. UNIF. R. EVID. 702 states:

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

**42.** *Santiago v. State*, 510 A.2d 488, 490 (Del. 1986) (citing DRE 703); *see also* DEL. UNIF. R. EVID. 703.

believed Pate was already dead when he woke up from his "sleep terror" episode, explaining that Rivera panicked when he realized he had attacked Pate, and that Rivera wanted to "conceal what had happened" by dumping Pate's body in the river. Although Dr. Mark was not permitted to opine that Rivera had actually suffered a "sleep terror" on that specific night, he nonetheless effectively told the jury Rivera's version of the facts—that Rivera attacked Pate during a "sleep terror" and then dumped Pate's body into the river because he thought she was already dead. To the extent that Rivera wished to present Dr. Mark's expert testimony to demonstrate that he (Rivera) did not have the requisite *mens rea* for first-degree murder, the testimony that Dr. Mark was allowed to give, achieved that. Rivera, accordingly, cannot show that the trial court's exclusion of Dr. Mark's testimony was prejudicial, and, in any event, the jury was not bound by Dr. Mark's expert testimony and chose to disregard it.[43] The jury instead concluded that Rivera had the requisite intent to kill Pate.

## CONCLUSION

For the reasons stated above, the judgment of the Superior Court is affirmed.

43. *State v. Magner,* 732 A.2d 234, 245 (Del.Super.Ct.1997) ("It is also important to note that if a medical expert states his conclusion whether a defendant was "acting under the influence ... at the time of a murder," the jury is not bound by this expert's testimony. A jury may always disregard the testimony of a witness and draw its own conclusions.") (internal citations omitted).