## IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JUAN RESTREPO-DUQUE, | § | |
| | § | No. 63, 2015 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware, |
| v. | § | in and for Kent County |
| | § | |
| STATE OF DELAWARE, | § | Cr. ID. No. 1002011017 |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: December 2, 2015
Decided: December 17, 2015

Before **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices.

## <u>ORDER</u>

This 17th day of December, 2015, it appears to the Court that:

(1)     On February 14, 2010, Kenton Wesley Wolf was shot with a BB gun and stabbed to death in his Smyrna residence. The police arrested Juan Restrepo-Duque ("Restrepo"), an eighteen-year-old Colombian national who had been living in the U.S. for seven years, and charged him with Wolf's murder. A Superior Court jury found Restrepo guilty of second degree murder, possession of a deadly weapon during the commission of a felony, motor vehicle theft, and carrying a concealed dangerous instrument. The Superior Court judge sentenced Restrepo to a lengthy jail term, followed by decreasing levels of supervision.

(2)     Restrepo appeals and argues that the Superior Court erred by (1) finding the nighttime search warrant of his residence and his subsequent arrest valid; (2) admitting into evidence Restrepo's statement made to police; and (3) admitting into evidence information found on Wolf's laptop computer and a social media profile and posts linking him to Wolf.

(3)     After reviewing the record and arguments on appeal, we affirm the judgment of the Superior Court.  The Superior Court did not abuse its discretion regarding the nighttime search warrant.  Although there were mistakes in the warrant, they were not essential to the probable cause determination.  The admission of Restrepo's statement to police, where the police arguably went beyond simple clarification of Restrepo's ambiguous invocation of his *Miranda* rights, presents a closer question under *Crawford v. State*.[1]  Looking at the totality of the circumstances of the interview, however, we find that the police did not run afoul of the clarification rule set forth in *Crawford*.  Finally, the Superior Court correctly found that the victim's laptop was properly authenticated, as were the social media posts.

(4)     Restrepo, using the profile "purecolombianblood," met Wolf on the internet.  On January 29, 2010, Wolf picked up Restrepo at a Newark grocery store, and together they drove to Wolf's home in Smyrna, Delaware.  There they

---

[1] 580 A.2d 571 (Del. 1990).

drank beer and watched television. On February 14, 2010, Wolf sent Restrepo an email asking to meet again in person. Wolf picked up Restrepo from the Newark library at around 3:00 p.m., and the two bought beer before driving to Wolf's house. According to Restrepo, they went upstairs to Wolf's bedroom to watch television and drink beer. Eventually, as Wolf attempted to touch Restrepo sexually, Restrepo claimed that he noticed a nine-inch knife on the nightstand. Restrepo testified that Wolf reached for the knife when he rebuffed Wolf's advances, but Restrepo grabbed the knife first. Restrepo sliced Wolf across the throat. Wolf then chased Restrepo out of the room, yelling at him to get out.

(5) Fearful that Wolf would call the police, Restrepo testified that he returned to the upstairs bedroom and found the door locked. He kicked the door open, shot Wolf with a BB gun, and stabbed him repeatedly. Once he was sure Wolf was dead, Restrepo pulled the bedding, the mattress, and the dresser on top of Wolf. He opened the windows and turned off the heat, despite it being a cold February day. Restrepo then retrieved the beer from the kitchen and packed a box with some of Wolf's belongings, including CDs, cellphones, a beeper, Wolf's laptop, and three sets of keys. Restrepo then left in Wolf's distinctive green 1994 Volkswagen Jetta. He stopped at a Kmart to buy new clothing and to dispose of his bloody clothes and shoes.

3

(6)     On February 15, 2010, Restrepo drove Wolf's car to the Newark Farmers Market.  He used Wolf's credit card to purchase two tasers and three knives.  He then threw the knife that he used to stab Wolf and the BB gun in a creek near his home.  He left Wolf's laptop buried in the snow in Deacons Walk Park.  Finally, he abandoned Wolf's Jetta in Brook Haven Park.

(7)     On February 19, 2010, after Wolf failed to show up to work, two of his coworkers went to his home to check on him.  They noticed the windows were open and saw his wallet and other personal belongings scattered on the front lawn.  They called the police, who discovered Wolf's body upstairs.

(8)     The police sent a desktop computer recovered from Wolf's home to the State Police High Tech Crimes Unit for analysis.  Later that same day, a tree surgeon in Deacons Walk Park discovered Wolf's laptop under the snow.  The police analyzed both of Wolf's computers and discovered that Wolf had communicated with someone using the screen name "purecolombianblood" on January 29 and February 14.  An internet search of "purecolombianblood" led to pictures and online profiles that linked the screen name to Restrepo.  The police also learned that Wolf's credit card had been used at the Newark Farmers Market on February 15.  A February 15 surveillance video of the Farmers Market parking lot showed Wolf's distinctive green Jetta pulling in and leaving, though the driver and the license plate number could not be identified.

(9)     The police secured a nighttime search warrant and went to Restrepo's house around midnight on February 22, 2010. The search warrant affidavit alleged that there was probable cause to suspect that Restrepo had stolen Wolf's car and used his credit card. At Restrepo's house, the police discovered the keys to Wolf's missing Jetta in the pocket of a pair of Restrepo's pants. The police brought Restrepo in for questioning in the early hours of February 23. After reading Restrepo his *Miranda* rights, Detective William Porter said, "Having these rights in mind, do you wish to talk to me about this case? Tell me your side of the story."[2] Restrepo answered, "I don't know. What would be better? If I talk to a lawyer."[3] The detective replied, "I mean it's up to you I mean, it's perfectly up to you I mean. It be nice to get your ahh side of the story out because if you don't get your side of the story out we got to go with . . . you know what I'm saying?"[4] Restrepo said he understood. The detective then said, "Okay. So you wish to tell me your side of the story?"[5] Restrepo replied, "Yeah why not."[6]

(10)    Restrepo then described the events of February 14 and 15. He also told the detective where Wolf's Jetta was and where the police could find the knife

---

[2] App. to Opening Br. at 151 (Restrepo's Transcribed Statement).
[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] *Id.*

he used to stab Wolf. The police subsequently located Wolf's car in Brook Haven Park, where Restrepo said it would be, and the knife in the creek near his house.

(11) Restrepo was charged with murder in the first degree, possession of a deadly weapon during the commission of a felony, theft of a motor vehicle, second degree forgery, and carrying a concealed dangerous instrument. He was indicted on June 7, 2010. On November 13, 2012, Restrepo filed a motion in limine, a motion to suppress, a motion for a *Franks* hearing, and a motion to prohibit the death penalty. The Superior Court denied the motions on February 19, 2013. A jury trial was held from January 27 to February 4, 2014, and Restrepo was convicted of all charges except second degree forgery.

(12) On April 15, 2014, the Superior Court held an office conference regarding the transcripts of Restrepo's police interview that were submitted to the jury during trial. The court found the submission of the transcripts to be conceivably prejudicial to Restrepo and granted a new trial on May 6, 2014. The second jury trial was held from November 17 to 26, 2014. Wolf's laptop and the social media posts linking "purecolombianblood" to Restrepo were admitted into evidence. Restrepo was again convicted of second degree murder, possession of a deadly weapon during the commission of a felony, theft of a motor vehicle, and carrying a concealed dangerous instrument. He appeals his convictions and the denial of his motions to suppress and for a *Franks* hearing.

6

(13)    Restrepo first argues the Superior Court erred in finding the nighttime search warrant valid, because the application and affidavit for the search warrant did not support a finding of probable cause after an analysis under *Franks v. Delaware*[7] and a reverse-*Franks* analysis.  This Court reviews a trial court's evidentiary rulings, including a denial of a motion to suppress, for abuse of discretion.[8]  The trial court's formulation and application of legal concepts are reviewed *de novo*,[9] but the trial court's factual findings will be upheld so long as they are not clearly erroneous.[10]

(14)    Under *Franks*, a defendant is entitled to a hearing when he has made a "substantial preliminary showing" that the police knowingly or "with reckless disregard for the truth" relied on a false statement to establish probable cause.[11]  To succeed under a reverse-*Franks* analysis, "a defendant must show by the preponderance of the evidence that the police knowingly and intentionally, or with reckless disregard for the truth, omitted information from the search warrant affidavit that was material to a finding of probable cause."[12]  If the defendant is successful, the result of the search warrant must be suppressed.[13]    When

---

[7] 438 U.S. 154 (1978).

[8] *Adams v. State*, __A.3d__, 2015 WL 5692291, at * 6 (Del. Sept. 28, 2015); *Rivera v. State*, 7 A.3d 961, 966 (Del. 2010).

[9] *Donald v. State*, 903 A.2d 315, 318 (Del. 2006).

[10] *Cooke v. State*, 977 A.2d 803, 854 (Del. 2009).

[11] *Franks*, 438 U.S. at 155-56.

[12] *Rivera*, 7 A.3d at 968.

[13] *Id*.

considering a search warrant affidavit, "a magistrate may find probable cause when considering the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"[14]

(15)  Restrepo argues that the police knowingly included false statements and omitted exculpatory information in the search warrant affidavit.  The search warrant affidavit described the knife and BB gun wounds to Wolf's body, and stated that a February 14 online conversation revealed that Wolf agreed to pick Restrepo up on that date.  The affidavit stated that EZ-Pass records showed that Wolf drove into New Castle County and back to Smyrna on that day.  It stated that the police reviewed video surveillance of the Newark Farmers Market parking lot and identified Restrepo exiting Wolf's 1994 Jetta.  Also, it stated that Wolf's wallet was missing.  Finally, the affidavit stated that Restrepo's family had been uncooperative with State Troopers and that there were locks on the bedroom doors at Restrepo's residence.

(16)  The search warrant affidavit contained inaccuracies.  Specifically, the EZ-Pass records did not show exactly who drove to New Castle County and back, the detective could not identify the license plate or the driver on the surveillance video, Wolf's coworkers said that they saw his wallet at his house, and the Troopers' report did not say Restrepo's family was uncooperative or that there

---

[14] *Sisson*, 903 A.2d at 296 (quoting *Stones v. State*, 676 A.2d 907 (Del. 1996) (Table)).

were locks on the bedroom doors. But under *Franks*, the allegedly false statements or omitted information must be necessary to a finding of probable cause before suppression is proper.[15] Here, the affidavit established probable cause without the inaccuracies. The fact that Restrepo had been communicating with Wolf about meeting, that Wolf's vehicle had traveled to and from where Restrepo was picked up, and that Wolf's car was later spotted being driven by someone who fit the general description of Restrepo created a reasonable inference that Restrepo had committed a crime and was in possession of evidence. The Superior Court therefore did not abuse its discretion in denying Restrepo's motion for a *Franks* hearing and for suppression of evidence.

(17) Relatedly, Restrepo argues under a reverse-*Franks* analysis that the police recklessly or intentionally omitted exculpatory information from the affidavit. Restrepo contends that the police should have included the fact that Wolf's computer revealed that he had been chatting with individuals other than Restrepo on February 14, and that the clerk at the Farmer's Market could not identify Restrepo as the individual who had used Wolf's credit card.[16] The

---

[15] 438 U.S. at 155-56.

[16] Restrepo also cites a time discrepancy between the time printed on the Farmer's Market receipt and the timestamp on the parking lot surveillance video as contributing to the alleged *Franks* violation. This alleged inconsistency appears to have only been brought up as part of one of the investigating officers' testimony at trial, and not in the context of an attempt to invalidate the affidavit of probable cause. *See* App. to Opening Br. at 268-69 (Trial Tr., Jan. 30, 2014). Restrepo did not raise this argument in any of his motions for *Franks* hearings, and the Superior Court did not address it. *See State v. Restrepo-Duque*, 2014 WL 1724755, at *1-3 (Del. Super.

Superior Court addressed the effect of the other chats on the probable cause determination, and concluded that it was immaterial.[17] The Superior Court also addressed the clerk's failure to identify Restrepo, and likewise concluded that it was immaterial to the probable cause determination.[18] In other words, there would have been probable cause even if the facts that Wolf was chatting with other individuals on the 14th and if the clerk's inability to identify Restrepo had been included in the affidavit. We agree. As discussed above, there was sufficient information to support the finding of probable cause, and the omitted information would not have affected the overall mix of information to change the outcome. As such, the Superior Court did not abuse its discretion.

(18) Restrepo also argues that because of the alleged errors in the search warrant affidavit, there was no probable cause for his arrest, and evidence obtained as a result of it should be suppressed. Because Restrepo failed to raise this contention before the Superior Court, we review only for plain error.[19] "Whether there was probable cause to arrest a defendant is determined under a totality of the

---

Apr. 15, 2014). It therefore was not fairly presented below, and Restrepo may not raise it now. *See* Supr. Ct. R. 8.

[17] *Restrepo*, 2014 WL 1724755, at *2 (finding there was probable cause even if the affidavit had said that Wolf had been communicating on February 14 with "a number of individuals, including 'purecolombianblood,' which a Google search linked to" Restrepo).

[18] *Id.* at *2-3.

[19] *Blake v. State*, 65 A.3d 557, 562 (Del. 2013) ("[T]he doctrine of plain error is limited to material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice") (quoting *Turner v. State*, 5 A.3d 612, 615 (Del. 2010)).

10

circumstances test."[20]  Restrepo was initially arrested for motor vehicle theft and using Wolf's credit card.  Because, as discussed above, there *was* probable cause to believe Restrepo had committed these offenses, there was no plain error.

(19)  Restrepo next argues that the Superior Court erred by not suppressing his statement to police.  The Superior Court found that Restrepo ambiguously invoked his right to counsel.  This Court has held that "[w]here a suspect does not *unequivocally* invoke that right, the police should be entitled to attempt to determine the suspect's intention" and has endorsed the "clarification approach" which may include "the repeating of *Miranda* warnings as a means of emphasizing the defendant's constitutional right to counsel."[21]  However:

> If . . . the police make additional inquiries concerning a suspect's intentions, the clarifying questions may not coerce or intimidate the suspect or otherwise discourage his effort to secure counsel, if that is his intention.  Nor may the police tender any legal advice or attempt to dissuade the suspect from pursuing an intended course.[22]

---

[20] *Jackson v. State*, 990 A.2d 1281, 1289 (Del. 2009); *see also* 11 *Del. C.* § 1904(b).

[21] *Crawford*, 580 A.2d at 577 (emphasis added).  The Superior Court noted the distinction between state and federal law on this issue:

> The United States Supreme Court has held that "the United States Constitution imposes no duty on police to cease questioning" when a suspect makes an ambiguous or equivocal request for counsel.  Instead, a suspect must unambiguously request counsel in order to trigger cessation of questioning.  However, the Delaware Supreme Court has held that the State Constitution provides additional constitutional protection, requiring police to clarify such ambiguous statements before continuing the interrogation.

*Restrepo*, 2014 WL 1724755, at *6 (footnotes omitted).

[22] *Crawford*, 580 A.2d at 577.

(20) In this case, Restrepo responded to a request to make a statement by saying, "I don't know. What would be better? If I talk to a lawyer."[23] Detective Porter responded, "I mean it's up to you I mean, it's perfectly up to you I mean. It be nice to get your ahh side of the story out because if you don't get your side of the story out we got to go with . . . you know what I'm saying?"[24] The Superior Court found that detective's statement was "probably not ideal," but nonetheless concluded that the statement did not exceed the bounds of clarification permitted by this Court in *Crawford*. According to the trial court, the detective's statement did not "coerce or intimidate" Restrepo, and did not "discourage his effort to secure counsel" because the extraneous statements did not reach the level of coercion found in other cases.[25] The Superior Court also relied heavily on the fact that, under the "totality of the circumstances," the interview did not appear coercive. According to the court, the questioning was conversational and Restrepo was not outwardly in distress—he expressly agreed to talk to the detective.

(21) The State does not challenge the ambiguity of Restrepo's reply to the *Miranda* warning. Instead, the State argues that this Court's decision in *Crawford* should be overruled in favor of the federal "bright line rule" where police may continue questioning in the face of an ambiguous or equivocal request for

---

[23] App. to Opening Br. at 151 (Restrepo's Transcribed Statement).
[24] *Id.*
[25] *Restrepo*, 2014 WL 1724755, at *7-8 (reviewing cases).

counsel.[26]  In the alternative, the State argues that based on the totality of the circumstances, the police questioning did not exceed the bounds of clarification.

(22)  We decline the State's invitation to overrule *Crawford*.  Applying *Crawford*, we agree with the Superior Court that the police questioning was less than ideal.  The detective's importuning of Restrepo to give his side of the story rather than invoke his right to counsel is troublesome.  The detective's answer to Restrepo's question could also be viewed as advice, rather than clarification.  But looking at the "totality of the circumstances," the detective's statement does not reach the level of coercion found in other cases.[27]  The questioning was not intimidating or coercive.  Further, Restrepo responded by saying "Why not?"  Based on our independent review of the interview, we agree with the Superior Court that Restrepo's statement was given voluntarily, knowingly, and intelligently, and the police did not exceed the bounds of permitted clarification.  Thus, under the totality of the circumstances, we affirm the Superior Court's ruling on this issue.

(23)  Additionally, Restrepo argues that the detective's failure to advise him of his consular rights under Article 36 of The Vienna Convention on Consular

---

[26] *See Davis v. United States*, 512 U.S. 452, 461 (1994) ("[A]fter a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney.").

[27] *See State v. Sumner*, 2003 WL 21963008, at *20 (Del. Super. Aug. 18, 2003) (holding that the detective's comment to the suspect that he was "flabbergasted right now as to why you would want a lawyer" was not a clarifying statement but "a coercive and systematic attempt to negotiate away Sumner's constitutional rights leading to an admission of guilt").

13

Relations precludes the use of Restrepo's statement to police. Under Article 36(1)(b), detaining authorities are required to advise foreign nationals, without delay, of their right to confer with their respective country's consulate. "Without delay" means that a detained foreign national must be advised of this right as soon as law enforcement realizes the person is a foreign national or "once there are grounds to think that the person is probably a foreign national."[28]

(24) The detective did not know that Restrepo was a citizen of Colombia prior to the interview. He testified at trial that he did not have reason to believe that Restrepo was "something other than a U.S. citizen," and Restrepo did not tell him anything about his citizenship prior to the interview.[29] Further, as held by the United States Supreme Court, Article 36 "secures only a right of foreign nationals to have their consulate informed of their arrest or detention—not to have their consulate intervene, or to have law enforcement authorities cease their investigation."[30] In this case, "[s]uppression [of Restrepo's statement] would be a vastly disproportionate remedy for an Article 36 violation."[31] Therefore, the Superior Court did not abuse its discretion in denying Restrepo's motion to suppress.

---

[28] *Avena and Other Mexican Nat'ls (Mex. v. U.S.)*, 2004 I.C.J. 12, 49 (Mar. 2004).
[29] App. to Opening Br. at 113 (Test. of Det. Porter).
[30] *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 349 (2006).
[31] *Id.*

(25) Next, Restrepo argues the Superior Court erred in admitting Wolf's laptop into evidence, because the State failed to fully establish the chain of custody of the computer. Restrepo contends there was a missing link in the chain of custody from the Deacons Walk Park tree surgeon, who found the laptop, to the detective who retrieved the laptop out of the evidence locker for investigation. Other than the fact that the laptop was powered up (but not modified) on February 16, 2010, there was no evidence that anyone tampered with the laptop or its contents.

(26) The trial judge has substantial discretion in deciding whether to admit evidence.[32] Under Delaware Rule of Evidence 901(a), the party offering evidence at trial must present other evidence "sufficient to support a finding that the matter in question is what its proponent claims."[33] The State has two avenues to authenticate physical evidence: "[i]t may have witnesses visually identify the item as that which was actually involved with the crime, *or* it may establish a 'chain of custody,' which indirectly establishes the identity and integrity of the evidence by tracing its continuous whereabouts."[34]

(27) In this case, the State presented witnesses who could identify the computer. The detective who analyzed Wolf's computers, a member of the State

---

[32] *Trioche v. State*, 525 A.2d 151, 152 (Del. 1987).
[33] D.R.E. 901(a).
[34] *Trioche*, 525 A.2d at 152 (quoting *Whitfield v. State*, 524 A.2d 13, 16 (Del. 1987)) (emphasis added).

Police High Tech Crimes Unit, identified the laptop computer as Wolf's at trial, because Wolf was its registered user. The tree surgeon who found the laptop also authenticated it as the same one he had found in the park. Because the State presented these witnesses, there was no need to establish a chain of custody[35] in order to identify the laptop, and the Superior Court did not err in admitting the laptop into evidence.

(28) Finally, Restrepo argues that the Superior Court abused its discretion by admitting into evidence an exhibit consisting of postings from an internet profile on a social gaming website linked to Restrepo. He argues that because the detective who was questioned about the postings at trial did not "discover" the profile, he lacked the knowledge to authenticate it. This Court has held that "the trial judge as the gatekeeper of evidence may admit [a] social media post when there is evidence sufficient to support a finding by a reasonable juror that the proffered evidence is what its proponent claims it to be."[36] Even though the detective who testified at Restrepo's trial may not have "discovered" the profile in question, he testified that he was familiar with it.[37] He also testified that he

---

[35] See 23 C.J.S. *Criminal Law* § 1142 ("A chain of custody for physical evidence may have to be established as part of the foundation for its admission, as in cases where physical evidence is not readily identifiable or may be susceptible to tampering. . . . The more fungible the evidence, . . . the more elaborate the foundation must be. . . . Whether a proper chain of custody has been established goes to the weight of the evidence rather than its admissibility.").

[36] *Parker v. State*, 85 A.3d 682, 688 (Del. 2014) (internal quotations omitted).

[37] App. to Opening Br. at 412 (Test. of Det. Willey) ("Q: Is it a website that you found on the Internet? A: Yes.").

personally ran an internet search for "purecolombianblood" and found the internet profile and postings in question. There was thus identification evidence sufficient to allow a reasonable jury to find the online profile was what the State claimed it to be—an online profile that belonged to Restrepo. The Superior Court therefore did not abuse its discretion in admitting the evidence.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED.

BY THE COURT:

/s/ *Collins J. Seitz, Jr.*
Justice